**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff
Daniel J. Brenner
305 BROADWAY, FLOOR 7
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
jbm@wittelslaw.com
djb@wittelslaw.com

**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**

D. Greg Blankinship
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

*Attorneys for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ERIC WEINBERG**, **ROBERT SUDAKOW**, and **JOANNE SUDAKOW**, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>    v.<br><br>**CLEANCHOICE ENERGY, INC.**,<br><br>     Defendant. | Civil Case No.:  23 Civ. 9685<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE CASE ............................................................................................. 1

PARTIES ................................................................................................................... 5

JURISDICTION AND VENUE .................................................................................. 6

FACTUAL ALLEGATIONS ....................................................................................... 7

    A.    The History Of Deregulation And ESCOs' Role In Electricity Markets ............... 7

    B.    Plaintiffs' Dealings With CleanChoice ................................................. 18

    C.    CleanChoice Violated New York's Variable Rate Disclosure Law ..................... 38

    D.    CleanChoice's Documented History of Deceptive Business Practices ............... 38

CLASS ACTION ALLEGATIONS ............................................................................. 42

CAUSES OF ACTION .............................................................................................. 45

COUNT I:  BREACH OF CONTRACT .................................................................... 45

COUNT II:  BREACH OF THE IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING ............................................................... 46

COUNT III:  VIOLATION OF NEW YORK GENERAL
BUSINESS LAW § 349 .............................................................................................. 48

COUNT IV:  VIOLATION OF NEW YORK GENERAL
BUSINESS LAW § 349-d(3) ...................................................................................... 52

COUNT V:  VIOLATION OF NEW YORK GENERAL
BUSINESS LAW § 349-d(7) ...................................................................................... 54

COUNT VI:  VIOLATION OF MATERIALLY IDENTICAL
STATE CONSUMER PROTECTION STATUTES ..................................................... 55

COUNT VII:  UNJUST ENRICHMENT .................................................................. 60

PRAYER FOR RELIEF ............................................................................................. 61

JURY DEMAND ....................................................................................................... 62

NOTICE TO ATTORNEY GENERAL AND OTHER
GOVERNMENT OFFICIALS ................................................................................... 62

Plaintiffs Eric Weinberg, Robert Sudakow, and Joanne Sudakow (collectively, the "Plaintiffs"), by their attorneys, Wittels McInturff Palikovic and Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, bring this proposed class action in their individual capacities, and on behalf of a class of consumers defined below, against Defendant CleanChoice Energy, Inc. (hereinafter "CleanChoice" or "Defendant") and hereby allege the following with knowledge as to their own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1.      This action seeks to redress CleanChoice's deceptive and bad faith pricing practices that have caused over a hundred thousand consumers in New York, New Jersey, Pennsylvania, Delaware, Ohio, Maryland, Washington, D.C., and Illinois to pay considerably more for their electricity than they should otherwise have paid.

2.      CleanChoice is an independent energy service company ("ESCO") that sells electricity in deregulated energy markets across the United States.  CleanChoice has taken advantage of deregulation to exploit consumers hoping to save on their electricity costs.

3.      CleanChoice's form customer contract uniformly represents to its New York customers that its variable rate for electricity

> may vary each month and is based on a number of costs which may
> include, but are not limited to energy, transmission, capacity,
> ancillary services, renewable energy certificates, RTO system fees
> and other factors, plus CleanChoice Energy operating costs,
> expenses, and margins.  This list of factors is not exhaustive and no
> single factor will determine the rate.  Additionally, we seek to
> acquire a majority of our anticipated electricity supply in advance
> rather than from the spot market.  For all of these reasons, your
> variable rate may not correlate with changes in wholesale market
> prices or your utility's rates.  Your variable rate may be higher than
> your utility rate or other suppliers' rates.

4.      Upon information and belief, Plaintiffs were subject to the same contractual terms for their variable rate for electricity as all CleanChoice customers in New York, which is substantially similar to the variable rate contractual terms for all of CleanChoice's customers in New Jersey, Pennsylvania, Delaware, Ohio, Maryland, Washington, D.C., and Illinois.

5.      CleanChoice's representations in its customer contract are false and deceptive, and designed to take advantage of consumers' good faith and lack of knowledge about, and access to, accurate wholesale and retail energy pricing information.  In reality, CleanChoice did not provide its customers with prices based upon the factors included in its contract, but rather used a pricing methodology that focused on maximizing profits.

6.      In addition, CleanChoice also misled its consumers about the nature of the energy it was supplying.

7.      For example, the direct mail marketing CleanChoice sent to Plaintiffs and its other customers contained several false, deceptive, and misleading representations. CleanChoice's marketing represented that signing up for CleanChoice meant the customer would be "**obtain[ing] your electricity from renewable sources provided by CleanChoice Energy**" (emphasis in original) and that "CleanChoice Energy will source wind and solar power from farms in your region."

8.      These statements are false and deceptive because the energy "provided by CleanChoice Energy" is not "from" renewable sources and CleanChoice's energy is not "source[d]" from "wind and solar power from farms in your region."  Instead, the energy "provided by CleanChoice Energy" is the same "brown" energy any customers' existing utility provides.  The only difference is that CleanChoice purportedly pairs customers' purchases with renewable energy certificates ("RECs") that represent the production of renewable energy by a

third party.  Purchasing RECs to offset burning "brown" energy is not the same as providing renewable energy directly to the customer's home, as CleanChoice's marketing falsely claims.

9.      As the staff of the New York Public Service Commission ("NYPSC") made clear in 2018, it is not possible for ESCOs to supply their customers with an energy mix that is any different from what customers' existing utility supplies and delivers on the ESCOs' behalf.   An ESCO like CleanChoice cannot divert the brown energy a customer would otherwise receive and then replace that energy with renewable energy sourced by the ESCO.  As the NYPSC staff found, "in almost every instance, a customer who switches from the utility to an ESCO is likely to receive the same or less renewable energy than they were receiving from the utility, even if they are sold a 'green' commodity product."[1]  Again, CleanChoice's purchase of RECs does not mean that customers are now "obtain[ing] [their] electricity from renewable sources provided by CleanChoice Energy" or are using energy "source[d from] wind and solar power from farms in your region."

10.      CleanChoice's marketing materials also falsely represented that customers who switched would get "**100% clean, pollution-free energy**."  Emphasis in original.  This statement is false and deceptive because the energy CleanChoice actually supplied and delivered to customers is not 100% clean or 100% pollution free.  Instead, the energy supplied to CleanChoice customers' meters is the same "brown" energy the customer would get if supplied by the utility.   The purchase of RECs does not make "brown" energy 100% clean or 100% pollution free.  The more energy a CleanChoice customer uses, the more pollution that customer creates.

---

[1] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 69–70 (Mar. 30, 2018).

11.    CleanChoice also abused the information asymmetry between it and its customers and omitted material information from its marketing materials.  For example, CleanChoice failed to adequately disclose (i) that CleanChoice's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) CleanChoice's actual variable rate methodology that it uses to calculate a customer's monthly variable rate, and (iii) the conditions that must be present for a variable rate customer to save money compared to what the customer's local utility would have charged.

12.    Finally, CleanChoice's marketing materials violated New York's specific variable rate disclosure law, N.Y. GEN. BUS. LAW § 349-d(7), which requires that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."  Here, the marketing materials CleanChoice's mailed to Plaintiffs never clearly and conspicuously identified that it would be charging a variable rate.  In fact, the marketing materials do not even use the word "variable" to describe CleanChoice's rates.

13.    As a result of CleanChoice's unlawful acts described herein, over a hundred thousand unsuspecting consumers have been, and continue to be, fleeced by CleanChoice out of millions of dollars in exorbitant electricity charges.  Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

14.    Plaintiffs and other CleanChoice customers (the "Class") have been injured by Defendant's unlawful practices.  Plaintiffs and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for CleanChoice's breach of contract, breach of the duty of good faith and fair dealing, violation of state consumer protection statutes, and unjust enrichment.

15.     Only through a class action can CleanChoice's customers remedy Defendant's ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge CleanChoice's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit.  Further, many customers do not realize they are victims of CleanChoice's deceptive and unlawful conduct.  With this class action, Plaintiffs and the Class seek to level the playing field and make sure that companies like CleanChoice engage in fair and upright business practices.

## PARTIES

16.     Plaintiff Eric Weinberg resides in Croton-Harmon, New York.  Plaintiff Weinberg signed up for fixed rate electricity with CleanChoice on or around June of 2017, and he was switched to a variable rate on or around March of 2020.  After he was switched to a variable rate, CleanChoice began charging an electricity rate that was not based on the factors outlined in CleanChoice's form customer contract but was instead much higher.  Mr. Weinberg continued to receive electricity from CleanChoice at a variable rate until May 2023.

17.     Plaintiffs Joanne and Robert Sudakow reside in Utica, New York.  Plaintiffs Joanne and Robert Sudakow signed up to receive their electricity supply from CleanChoice in October 2021.  The Sudakows were CleanChoice variable rate electricity customers until August 2022.  Plaintiffs Joanne and Robert Sudakow are married to one another.

18.     As a result of Defendant's deceptive and otherwise improper, unlawful, and unauthorized conduct, Plaintiffs incurred excessive charges for electricity.

19.     Defendant CleanChoice Energy, Inc. is a Maryland corporation headquartered at 1055 Thomas Jefferson St. NW, Washington, DC 20007.  CleanChoice sells electricity supply to

residential and commercial customers in New York, New Jersey, Massachusetts, Pennsylvania, Delaware, Ohio, Maryland, Washington, D.C., and Illinois.  In 2021, CleanChoice had 216,996 customers with an annual revenue of $215.1 million.[2]

## JURISDICTION AND VENUE

### *Subject Matter Jurisdiction*

20.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

### *Specific Jurisdiction*

21.     This Court has specific jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution, and sale of electricity to Plaintiff and other New York consumers.

### *Venue*

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).  Substantial acts in furtherance of the alleged improper conduct occurred within this District.  From June 2017 to May 2023, CleanChoice supplied electricity to Plaintiff Weinberg's residence, located in Croton-Harmon, Westchester County, New York.

---

[2] About CleanChoice Energy, *available at* https://findenergy.com/providers/clean-choice-energy/ (last visited Nov. 2, 2023)

## FACTUAL ALLEGATIONS

**A.    The History Of Deregulation And ESCOs' Role In Electricity Markets**

23.    In the 1990s, numerous state legislatures and state regulatory agencies, including the New York Public Service Commission ("NYPSC"), deregulated the market for retail energy supply.  Among the goals of deregulation were increased competition, with an eye towards reducing energy rates consumers and small businesses pay.  As a result, the electricity supply market is open to competition, and consumers and small businesses may choose their energy supplier.

24.    Since New York opened its retail electric markets to competition, millions of New York residential and small business customers have switched to an ESCO.  Deregulation laws in other states are substantially similar.

25.    ESCOs, the new energy suppliers, compete primarily against local utilities. ESCOs purchase energy directly or indirectly from companies that produce energy.  ESCOs then sell that energy to end-user consumers.  However, ESCOs do not ***deliver*** energy to consumers' homes and businesses, and many do not produce electricity.  Rather, the companies that produce energy deliver it to consumers' utilities, which in turn deliver it to the consumer.  ESCOs merely buy electricity and then sell that energy to end-users with a mark-up.  Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver electricity, but merely buy energy from a producer and re-sell it to consumers.  The local utility also continues to bill the customer for both the energy supply and delivery costs.  The only difference to the customer is whether the utility or an ESCO sets the price for the customer's energy supply.  The only value that ESCOs add in the electricity markets is their ability to reduce costs to consumers like Plaintiffs.  Absent such savings, ESCOs merely siphon money from end users in the form of increased (and unnecessary) charges.

26.     ESCOs are subject to minimal regulation by state utility regulators like the

NYPSC.  ESCOs like CleanChoice do not have to file their rates with regulators, or the method

by which those rates are set.

27.     Consumers who do not switch to an ESCO for their energy supply continue to

receive their supply from their local utility.  For example, in New York, as in many states, the

utilities charge energy supply rates that reflect the same supply costs ESCOs like CleanChoice

incur.  This is because the utilities' rates pass on the energy supply cost on the New York

Independent System Operator's ("NYISO") competitive short-term market (commonly referred

to as "real-time" pricing or the "spot market") for wholesale electricity and the associated market

costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ESCOs such

as CleanChoice incur).  New York utilities purchase energy, ancillary services, and capacity

from NYISO's wholesale market based on customer consumption and pass actual costs on to

their customers.

28.     ESCOs like CleanChoice can purchase wholesale electricity using the exact same

wholesale market as utilities at the exact same prices.  Here, Plaintiffs' utilities—Consolidated

Edison's ("ConEd") and National Grid—purchase electricity on the "day ahead" market,

meaning they purchase electricity in advance rather than in the real-time spot market.[3]

29.     Indeed, ESCOs such as CleanChoice have more options to acquire electricity than

the utilities, including: owning energy production facilities; purchasing energy from wholesale

---

[3] ConEd, *Supply Charges*, ("Each day the NYISO publishes next-day pricing information by hour by zone . . . The hourly pricing reflects the wholesale rate per kWh."), *available at* https://lite.coned.com/_external/cerates/supply_charges.asp (last visited Nov. 2, 2023); National Grid, *What is hourly pricing and what does it mean for you?*, ("National Grid passes through the wholesale market costs of electric commodity to retail supply prices – Day Ahead Location-Based Marginal Price"), *available at* https://www9.nationalgridus.com/niagaramohawk/non_html/seminar-2.pdf (last visited Nov. 2, 2023).

marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing energy in advance of the time it is used by consumers, for example by purchasing futures contracts for the delivery of electricity in the future at a predetermined price. The fundamental purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce energy acquisition costs and pass those savings on to consumers.

30.     Because of their increased flexibility, ESCOs can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do.  Yet CleanChoice's variable rates are consistently and substantially higher than the local utility's and wholly detached from its costs; accordingly, no consumer would ever agree to CleanChoice's variable rate if they knew the truth.  The only way CleanChoice can retain variable rate customers is by hiding the fact that the primary component of the variable rate is not CleanChoice's actual costs, but CleanChoice's unbridled price gouging and profiteering.

31.     CleanChoice took advantage of deregulation and the lack of regulatory oversight to charge consumers exorbitant rates for electricity.  In theory, energy deregulation allows consumers to shop around for the best energy rates, and it allows consumers to take advantage of market-based rates that decline when wholesale costs decline.  However, CleanChoice exploits deregulated markets by consistently charging its customers far more than the local utility and failing to adequately disclose how its variable rates are determined.

32.     One of deregulation's main unintended consequences has been the proliferation of ESCOs like CleanChoice whose business model is primarily based on taking advantage of consumers.  As a result of this widespread misconduct, states like New York began enacting post-deregulation remedial legislation meant to "establish[] important consumer safeguards in the marketing and offering of contracts for energy services to residential and small business

customers."[4]  As the sponsoring memorandum notes, the ESCO Consumers Bill of Rights,

codified as G.B.L. Section 349-d, in 2010 sought to end the exact type of deceptive conduct

Plaintiffs challenges here:

> Over the past decade, New York has promoted a competitive retail model for the provision of electricity and natural gas.  Consumers have been encouraged to switch service providers from traditional utilities to energy services companies.  Unfortunately, consumer protection appears to have taken a back seat in this process.
>
> * * *
>
> High-pressure and misleading sales tactics, onerous contracts with unfathomable fine print, short-term "teaser" rates followed by skyrocketing variable prices—many of the problems recently seen with subprime mortgages are being repeated in energy competition.  Although the PSC has recently adopted a set of guidelines, its "Uniform Business Practices" are limited and omit important consumer protections in several areas.  The fact is, competition in supplying energy cannot succeed without a meaningful set of standards to weed out companies whose business model is based on taking unfair advantage of consumers.[5]

33.     New York regulators also began to call out the high levels of misconduct that

pervaded the state's deregulated energy markets.  For example, in 2014 the NYPSC concluded

that New York's residential and small-commercial retail energy markets were plagued with

"marketing behavior that creates and too often relies on customer confusion."[6]  The NYPSC

further noted "it is extremely difficult for mass market retail energy customers to access pricing

---

[4] ESCO Consumers Bill of Rights, N.Y. Sponsors Mem., 2009 A.B. 1558, at 1 (2009).

[5] *Id.* at 3–4.

[6] NYPSC, CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 4 (Feb. 25, 2014).

information relevant to their decision to commence, continue or terminate service through an

ESCO."[7]  The NYPSC concluded that:

> [A]s currently structured, the retail energy commodity markets for
> residential and small nonresidential customers cannot be considered
> to be workably competitive.  Although there are a large number of
> suppliers and buyers, and suppliers can readily enter and exit the
> market, the general absence of information on market conditions,
> particularly the price charged by competitors, is an impediment to
> effective competition[.][8]

34.    Statistics from the New York Attorney General's ("NYAG") office confirm the

pattern of activity this consumer class action seeks to combat.  From at least the year 2000 to the

present, the NYAG has investigated numerous ESCOs' deceptive and illegal business practices.

These investigations have resulted in multiple settlements providing for extensive injunctive

relief and millions in restitution and penalties.

35.    The unlawful conduct of ESCOs like CleanChoice has been devastating to New

York consumers.  For example, "[a]ccording to the data provided by [New York's] utilities, the

approximately two million New York State residential utility customers who took commodity

service from an ESCO collectively paid almost $1.2 billion more than they would have paid if

they purchased commodity from their distribution utility during the 36-months ending December

31, 2016."[9]  "Additionally, small commercial customers paid $136 million more than they would

have paid if they instead simply remained with their default utilities for commodity supply for

---

[7] *Id*. at 11.

[8] *Id*. at 10.

[9] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at 2
(Mar. 30, 2018).

the same 36-month period."[10]  Combining these two groups, New York consumers have been

"'overcharged' by over $1.3 billion dollars over this time period."[11]

36.     New York's low-income consumers have also been hit hard.  The utilities

reported that low-income ESCO customers (a subset of the residential customers mentioned

above) "collectively paid in excess of $146 million more than they would have paid if they took

commodity supply from their utility."[12]

37.     On December 16, 2016, based on the flood of consumer complaints, negative

media reports, and data demonstrating massive overcharges, the NYPSC prohibited ESCOs from

serving low-income customers, because of "the persistent ESCO failure to address (or even

apparently to acknowledge) the problem of overcharges to [low income] customers[.]"[13]

38.     Following the first part of the evidentiary hearing announced in December 2016,

on March 30, 2018, NYPSC staff reached the following conclusions about ESCOs in New York:

> [M]ass market ESCO customers have become the victims of a failed
> market structure that results in customers being fooled by
> advertising and marketing tricks into paying substantially more for
> commodity service than they had remained full utility customers,
> yet thinking they are getting a better deal.  Rather than fierce ESCO
> against ESCO price competition working to protect customers from
> excessive charges, ESCOs have deliberately obfuscated prices and
> resisted market reforms such that the Commission's decision to
> allow ESCOs access to the utility distribution systems to sell electric
> and gas commodity products to mass market customers has proven
> to be no longer just and reasonable.[14]

---

[10] *Id.* at 3.

[11] *Id.*

[12] *Id.*

[13] NYPSC, CASE 12-M-0476, Order Adopting A Prohibition On Service To Low-Income
Customers By Energy Services Companies, at 3 (Dec. 16, 2016).

[14] NYPSC, CASE 12-M-0476, Dep't of Public Service Staff Unredacted Initial Brief, at 1 (Mar. 30, 2018).

* * *

The primary problem with the retail markets for mass market customers is the overcharging of customers for commodity due to the lack of transparency to customers on ESCO prices and products; this lack of transparency allows ESCOs to charge customers practically whatever they want without customers' understanding that they are paying substantially more than if they received full utility service.   Consequently, potential commodity customers attempting to choose between the ESCO offerings and the default utility service cannot readily determine which ESCO offers the best price for comparable products or if the ESCOs' prices can possibly "beat" or even be competitive with the utility's default commodity service for the duration of the contract term.

Thus, as the current retail access mass markets are structured, customers simply cannot make fully informed and fact-based choices on price . . . since the terms and pricing of the ESCO product offerings are not transparent to customers.   For variable rate products this is due, in large part, to the fact that ESCOs often offer "teaser rates" to start, and after expiration of the teaser rate, the rate is changed to what is called a "market rate" that is not transparent to the customer, and the contract signed by the customer does not provide information on how that "market rate" is calculated.[15]

* * *

ESCOs take advantage of the mass market customers' lack of knowledge and understanding of, among other issues, the electric and gas commodity markets, commodity pricing, and contract terms (which often extend to three full pages), and in particular, the ESCOs' use of teaser rates and "market based rate" mechanisms that customers are charged after the teaser rate expires.   In fact, ESCOs appear to be unwilling to provide the necessary product pricing details as to how those "market based rates" are derived to mass market customers in a manner that is transparent so as to enable an open and competitive marketplace where customers can participate fairly and with the necessary knowledge to make rational and fully informed decisions on whether it is in their best interest to take commodity service from their default utility, or from a particular ESCO among competing but equally opaque choices.[16]

---

[15] *Id.* at 41–42 (citations omitted).

[16] *Id.* at 86 (citations omitted).

39.    As for the ESCOs' claim that their marketing and overhead costs explain the overcharges, NYPSC staff found that these costs do "not justify the significant overcharges" ESCOs levied.[17]  Likewise, when the ESCOs claimed that their provision to consumers of so-called value-added products, such as light bulbs and thermostats, contributed to their excessive rates, NYPSC staff found that "the cost incurred . . . in procuring these sorts of value-added products is at best de minimis and does not explain away the significantly higher commodity costs charged by so many ESCOs."[18]

40.    Similarly, the NYPSC staff found that the "claim that at least a portion of the significant delta between ESCO and utility charges is explained by ESCOs offering renewable energy is disingenuous at best.  ESCOs may be charging a premium for green energy, but they are not actually providing a significant amount of added renewable energy to customers in New York."[19]  The NYPSC staff went on to state that "[t]he fuel mixes of electricity purchased on the spot market cannot be disaggregated, meaning that an ESCO cannot 'divert' the renewable portion of the spot market electricity to some customers, while serving other customers with the electricity" and that "in almost every instance, a customer who switches from the utility to an ESCO is likely to receive the same or less renewable energy than they were receiving from the utility, even if they are sold a 'green' commodity product."[20]

41.    Instead, NYPSC staff reached the following conclusion:

> The massive $1.3 billion in overcharges is the result of higher, and more often than not, significantly higher, commodity costs imposed by the ESCOs on unsuspecting residential and other mass market

---

[17] *Id.* at 37.

[18] *Id.* at 87.

[19] *Id.* at 69.

[20] *Id*. at 69–70.

customers. These Overcharges are simply due to (1) the lack of transparency and greed in the market, which prevents customers from making rational economic choices based on facts rather than the promises of the ESCO representative, and (2) obvious efforts by the ESCOs to prevent, or at least limit, the transparency of the market. These obvious efforts include the lack of a definition for "market rate" in their contracts, resulting in the fattening of ESCOs' retained earnings.[21]

42.    Then, on December 12, 2019, the NYPSC issued bombshell regulatory changes that banned, starting in February 2020, the variable rate pricing practices engaged in by CleanChoice and impact the entire New York ESCO marketplace.[22]

43.    The NYPSC's press release announcing the new regulations stressed that banning variable energy rates was intended to "prevent[] bad actors among ESCOs from overcharging New York consumers" and that the regulations only went forward after "the state's highest court definitively halted ESCOs' attempts to use litigation to evade and/or delay consumer-protection regulation."[23]    The regulations themselves likewise condemn ESCOs' conduct and declare that deception has become a "business model" in the deregulated energy market:

Based upon the number of customer complaints that continue to be made against ESCOs, and the likely need for increased enforcement activities, the large number of ESCO customers that pay significant premiums for products with little or no apparent added benefit, . . . it appears that a material level of misleading marketing practices continues to plague the retail access market.

* * *

_____

[21] *Id.*

[22] NYPSC, CASE 12-M-0476, Order Adopting Changes to the Retail Access Energy Market and Establishing Further Process ("December 12 Order"), at 108–10 (Dec. 12, 2019), *available at* https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId={045F848D-2346-43F3-BD7D-D419077134C7}(last visited Nov. 2, 2023).

[23] Press Release, NYPSC, PSC Enacts Significant Reforms to the Retail Energy Market (Dec. 12, 2019), *available at* https://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7B2F86EF23-5B31-46D3-846D-DAD7C0D7381A%7D (last visited Nov. 2, 2023).

> The persistence of complaints related to ESCO marketing practices is indicative of some ESCOs continuing to skirt rules and attempting to avoid accountability as part of their business model.[24]

44.     The NYPSC's variable rate ban followed its two-year investigation of ESCO practices that culminated in a ten-day evidentiary hearing to examine evidence submitted by 19 parties, and to hear the testimony and cross-examination of 22 witnesses and witness panels.[25]

45.     The NYPSC prefaced the variable rate ban with the observation that variable energy rates like those Defendant charged Plaintiffs and the Class are "[t]he most commonly offered ESCO product" and that this popular product is frequently provided at "a higher price than charged by the utilities."[26]  The incongruity of consumers paying ESCOs more for the exact same energy offered by regulated utilities was not lost on the NYPSC:

> If market participants are unwilling, or unable, to provide material benefits to consumers beyond those provided by utilities in exchange for a regulated, just and reasonable rate, the market serves no proper purpose and should be ended.[27]

46.     In fact, the NYPSC found it "troubling" that even after considering reams of evidence "neither ESCOs nor any other party have shown . . . that ESCO charges above utility rates were generally – or in any specific instances – justified."[28]  This fact only highlighted the NYPSC's "long-held concern that many customers may only be taking ESCO service due to their misunderstanding of [ESCOs'] products and/or prices."[29]  Accordingly, and on this record,

---

[24] December 12 Order at 88–90.

[25] *Id.* at 3–4.

[26] *Id.* at 11.

[27] *Id.* at 12.

[28] *Id.* at 30.

[29] *Id.* at 31.

the NYPSC banned variable energy rates like those Defendant charged to Plaintiffs and the Class.[30]  In place of these floating variable rates, the NYPSC required ESCOs to guarantee that their variable rates would save customers money compared to what the utility would have charged.[31]  Under the new regulations, if the ESCO charges the consumer more than the utility, the consumer is owed a refund for the difference.[32]  In this litigation, the difference between what CleanChoice charged consumers for the same energy Class members' utilities would have charged is likely in the tens of millions of dollars.

47.    Moreover, the NYPSC's findings of widespread and unjustified overcharging underscores and highlights the importance and perniciousness of Defendant's practices challenged in this lawsuit.  Likewise, the NYPSC's findings that ESCOs' overcharging is completely unjustified bolsters Plaintiffs' claims that Defendant's variable rate pricing practices breached the duty of good faith and fair dealing.  ESCOs go undetected because it is virtually impossible for consumers to ferret out the fact that they are being overcharged.

48.    In its December 12 Order, the NYPSC faulted ESCOs for concealing critical pricing data from both ordinary consumers *and the NYPSC itself*: "without transparent or unbundled pricing data, neither the Commission nor ESCO customers can evaluate whether the prices being charged by ESCOs are just and reasonable."[33]

---

[30] *Id.* at 39.

[31] *Id.*

[32] *Id.*

[33] *Id.* at 31.

49.    The NYPSC then proceeded to "reject all arguments that customers will be better off in a retail market that permits opaque and confusing ESCO pricing/billing to continue"[34] and required that ESCO bills show how much the consumer's utility would have charged.[35]

50.    In addition, just recently and in response to the mounting evidence of ESCOs' improper pricing practices, on September 20, 2023, New York Governor Kathy Hochul signed new legislation (A.703-A/S.683-A) to eliminate "surprise price increases" by requiring that ESCOs obtain express consent from customers prior to increasing prices.[36] The legislation was introduced after reports that ESCOs in New York, like CleanChoice, charge some of the highest residential energy costs in the United States.[37]

51.    New York is not the only state using the overwhelming evidence of consumer harm to take action to finally put an end to ESCOs' deceptive variable rate pricing practices.

**B.    Plaintiffs' Dealings With CleanChoice**

52.    In or around June of 2017, CleanChoice began supplying electricity to Plaintiff Weinberg's residence at a fixed rate. In or around March of 2020, CleanChoice switched Mr. Weinberg to a variable electricity rate. Mr. Weinberg continued to receive electricity from CleanChoice at a variable rate until May of 2023.

53.    In or around the fall of 2021, CleanChoice sent the Sudakows a mailer containing marketing material that included Defendant's "CLEAN ENERGY AUTHORIZATION FORM,"

---

[34] *Id.* at 33.

[35] *Id.* at 33–34.

[36] Press Release, Governor Kathy Hochul, Governor Hochul Signs Legislation to Protect Consumers from Surprise Price Increases in Energy Bills (Sept. 20, 2023), *available at* https://www.governor.ny.gov/news/governor-hochul-signs-legislation-protect-consumers-surprise-price-increases-energy-bills (last visited Nov. 2, 2023).

[37] N.Y. State Assembly Sponsors Mem., Bill No. A703A, at 1 (2023).

a marketing insert titled "Frequently Asked Questions About Switching to Clean Energy," and two copies of CleanChoice's form customer contract.  Attached hereto as **Exhibit A** is a copy of the mailer CleanChoice sent to the Sudakows.[38]  The Sudakows reviewed the mailer's contents and thereafter decided to sign up for CleanChoice.  The marketing material and authorization form were addressed to Plaintiff Joanne Sudakow, and she permitted Mr. Sudakow to sign the authorization form in her name, which he then did.

54.    The "CLEAN ENERGY AUTHORIZATION FORM" Plaintiff Robert Sudakow signed also states that "I have reviewed and accept the enclosed terms and conditions and Bill of Rights."  Ex. A at 4.  The terms and conditions enclosed with the authorization form make clear they "constitute the entire Agreement between Customer and CleanChoice with regard to Customer's purchase of electric commodity and other related services from CleanChoice."  *Id.* at 1.  CleanChoice's form customer contract does not incorporate any other documents by reference or express an intent to make any separate, future terms a part of the contract.  No reasonable person would understand that by signing CleanChoice's authorization form they would be agreeing to any contract terms beyond the terms and conditions enclosed with the authorization form.  In a March 16, 2023, letter from CleanChoice's General Counsel Jennifer L. Spinosi to the New York Office of the Attorney General, which letter is labeled by Ms. Spinosi as CleanChoice's "official response" to Sudakows' complaint to the Attorney General, CleanChoice admits that the only contract included with the "CLEAN ENERGY AUTHORIZATION FORM" Plaintiff Robert Sudakow signed were the unexecuted versions of

---

[38] Exhibit A is a form reproduction of the contract and marketing materials Defendant mailed to Plaintiff Joanne Sudakow along with an image of the executed authorization form.  Upon information and belief, Plaintiff Weinberg received, reviewed, and signed the same or a substantially similar materials.

the documents attached hereto as Exhibit A.  No other contract was included with the "CLEAN

ENERGY AUTHORIZATION FORM" Plaintiff Robert Sudakow signed.

55.    The contract enclosed with the mailer CleanChoice sent to the Sudakows contains

a variable rate pricing term that represents that CleanChoice's variable rate for electricity "may

vary each month and is based on a number of costs which may include, but are not limited to

energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system

fees and other factors, plus CleanChoice Energy operating costs, expenses, and margins."

56.    In December 2021, CleanChoice began supplying electricity to the Sudakows'

residence at a variable rate and it continued to do so until August 2022.

57.    Upon information and belief, Plaintiffs were subject to the same contractual terms

for their variable rate for electricity as CleanChoice's other New York customers, which are

substantially similar to the variable rate contractual terms for all CleanChoice electric customers

in New Jersey, Massachusetts, Pennsylvania, Delaware, Ohio, Maryland, Washington, D.C., and

Illinois.

58.    In light of CleanChoice's representations in its form contract, any reasonable

consumer, including Plaintiffs, would reasonably expect that CleanChoice's variable rates "based

on" its costs and would reflect CleanChoice's actual costs plus a reasonable fixed margin.

59.    Unfortunately, CleanChoice did not charge variable rates based on its costs and a

reasonable fixed margin.  Instead, CleanChoice charged its customers variable rates that were

untethered from its costs to maximize its own profits.

60.    The direct-mail solicitation CleanChoice sent to Plaintiffs also makes false and

deceptive claims about the nature of the energy CeanChoice supplies.  For example,

CleanChoice represents that signing up for CleanChoice means the customer will be

"**obtain[ing] your electricity from renewable sources provided by CleanChoice Energy**" (emphasis in original) and that "CleanChoice Energy will source wind and solar power from farms in your region." Similarly, CleanChoice claims that its customers get "**100% clean, pollution-free energy.**" Ex. A at 4 (emphasis in original).

61.    Yet, rather than producing renewable energy or procuring energy from renewable energy producers, CleanChoice simply purchases renewable energy credits ("RECs") that represent the production by another entity of wind and solar energy in the form of RECs. CleanChoice then charges its customers for these RECs. Accordingly, and consistent with the NYPSC's findings, customers are not actually "using" or supplied renewable "green" electricity but are instead supplied with the same "brown" energy derived from fossil fuels paired with offsets for fossil fuel consumption.

62.    Further, CleanChoice's costs associated with purchasing RECs are minimal compared to the cost of procuring electricity in wholesale markets, and RECs costs cannot explain CleanChoice's exorbitant rates. Indeed, from June 2021 through June of 2023, the cost to purchase a corresponding REC in New York averaged to about 2.1 cents per kilowatt hour. CleanChoice both failed to provide this critical information and charged consumers far more for their electricity supposedly sourced from "wind and solar power from farms in your region" than provided for in the pricing term of CleanChoice's contract.

63.    Other than a desire to promote or use renewable energy, price is the most important consideration for potential CleanChoice energy consumers. Given that there is no difference at all in the electricity that ESCOs supply as opposed to the consumer's local utility, the only reason a consumer would switch to CleanChoice is for the potential savings offered in a

competitive market as opposed to prices offered by a regulated utility, plus a willingness to pay the costs of RECs.

64.    The publicly available data on the local utilities' energy procurement costs (like National Grid and ConEd, the utilities serving Plaintiffs' residences), serve as an ideal source of the wholesale cost of energy and the other applicable market-based costs because the utilities pay these costs, which are the same costs ESCOs like CleanChoice incur.

65.    Not only are local utilities CleanChoice's primary competitors (as utilities always are), but National Grid and ConEd procurement costs are the best indicator market-based costs. These utilities' procurement costs track the competitive public market for wholesale electricity and the associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ESCOs such as CleanChoice incur).  In other words, Plaintiffs' utilities purchase wholesale electricity for their customers on an open free market and pass those costs onto consumers; CleanChoice could do the same.

66.    True, CleanChoice's customer contract states that it "seek[s] to acquire a majority of our anticipated electricity supply in advance rather than from the spot market."  Plaintiffs' utilities do the same, as they purchase electricity in advance as well.  To the extent CleanChoice procures its wholesale energy supply materially in advance of Plaintiffs' utilities, such advance purchases cannot explain CleanChoice's persistently high rates.  First, while electricity bought further in advance might not exactly match the prices utilities pay in advance, over time those costs should be commensurate as they are both based on market forces.  Second, to the extent CleanChoice pays a premium to lock in advance wholesale prices, such hedging strategies should smooth the peaks and valleys of short-term wholesale price fluctuations, which, again, should over time be commensurate with utilities' costs.

67.     Consequently, the public data on local utilities' electricity supply costs are the ideal comparator here because they are CleanChoice's primary competitor and the utilities' costs represent wholesale market prices for electricity and associated costs (even when accounting for REC costs).

68.     In fact, CleanChoice has a tactical advantage over the utilities as it can (and does) combine wholesale purchasing with additional financial products.  For example, in a January 9, 2018 interview, CleanChoice's CEO Tom Matzzie stated "[w]e're a member of the wholesale energy markets" including "the wholesale power markets, the PJM and New York ISO and ISO New England and MISO."[39]  The CEO continued, "we transact there with the suppliers" and "we have trading relationships with wholesale energy suppliers, generators, and investment banks who provide financial derivatives."[40]  The CEO also made clear that CleanChoice's wholesale "procurement" is "actually the least exciting and interesting part of our business.  It doesn't move very fast and that's good.  We're not speculators."[41]

69.     Accordingly, CleanChoice's costs for purchasing energy should at the very least reflect (if not undercut) market prices, albeit over a longer term.  Therefore, while the utility's procurement costs might not precisely match Defendant's actual costs (which are not available absent discovery), the latter's costs should correlate with the utility's costs and over time should be roughly similar (even when accounting for REC costs).  Instead, CleanChoice's exorbitant rates when compared to CleanChoice's supply costs demonstrate that CleanChoice's rates were not "based on" its costs as required by its customer contract.

---

[39] Experts Only Podcast, *Interview with CleanChoice CEO Tom Matzzie*, *available at* https://cleancapital.com/resources/episode-14-tom-matzzie/ (last visited Nov. 2, 2023).

[40] *Id.*

[41] *Id.*

70.     Pursuant to CleanChoice's contract, which is attached to the Complaint as Exhibit A, Plaintiffs Robert Sudakow and Joanne Sudakow received a fixed introductory rate of 7 cents per kilowatt hour for their first month of service.  After that fixed rate expired, CleanChoice began to increase their electricity rate every month.

71.     The following table compares Plaintiffs Robert Sudakow and Joanne Sudakow's variable electricity supply rates from CleanChoice for the 7 billing periods accessible to Plaintiffs from January 2022 to August 2022 to their local utility National Grid's contemporaneous electricity supply costs.  These are the rates that began after CleanChoice's teaser rate of 7 cents per kilowatt hour expired.

| Billing Period | CleanChoice Rate (Cents Per kWh) | National Grid's Supply Costs (Cents per kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 1/7/2022 – 2/7/2022 | 13.7 | 6.2 | 1.74x | 74% |
| 2/7/2022 – 3/8/2022 | 16.3 | 6.1 | 1.95x | 95% |
| 3/8/2022 – 4/8/2022 | 18.8 | 8.4 | 2.24x | 124% |
| 4/8/2022 – 5/9/2022 | 22.3 | 5.2 | 4.29x | 329% |
| 5/9/2022 – 6/8/2022 | 25.2 | 5.1 | 2.91x | 191% |
| 6/8/2022 – 7/8/2022 | 29.3 | 5.7 | 3.00x | 200% |
| 7/8/2022 – 8/8/2022 | 31.8 | 6.4 | 2.73x | 173% |

72.     The "Overcharge Percentage" column demonstrates the drastic difference between CleanChoice's rates for Plaintiffs' account and National Grid's contemporaneous

supply costs.  The "Overcharge Factor" column demonstrates the factor at which CleanChoice overcharged Plaintiffs compared to the reasonable benchmark of National Grid's supply costs. CleanChoice's rates were more than double National Grid's supply costs for 5 of the 7 billing periods and was more than *four times* National Grid's supply costs in April 2022.  On average, CleanChoice's rates were 2.69 times (169% overcharge) National Grid's supply costs.

73.    The following table compares Plaintiff Weinberg's variable electricity supply rates from CleanChoice for the 22 billing periods accessible to Plaintiff from June 2021 to April of 2023, to his local utility's ConEd's contemporaneous electric supply costs.

| Billing Period | CleanChoice Rate (Cents per kWh) | ConEd Supply Costs (Cents per kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/16/2021 – 7/16/2021 | 17.8 | 7 | 2.41x | 141% |
| 7/16/2021 – 8/16/2021 | 17.1 | 7 | 2.51x | 151% |
| 8/16/2021 – 9/15/2021 | 19.5 | 7 | 2.69x | 169% |
| 9/15/2021 – 10/15/2021 | 20.3 | 7 | 2.78x | 178% |
| 10/15/2021 – 11/15/2021 | 20.3 | 8 | 2.71x | 171% |
| 11/15/2021 – 12/16/2021 | 24.0 | 6 | 4.23x | 323% |
| 12/16/2021 – 1/18/2022 | 24.1 | 10 | 2.39x | 139% |
| 1/18/2022 – 2/16/2022 | 26.3 | 16 | 1.69x | 69% |
| 2/16/2022 – 3/18/2022 | 26.1 | 10 | 2.51x | 151% |
| 3/18/2022 – 4/18/2022 | 26.1 | 6 | 4.30x | 330% |

| 4/18/2022 – 5/17/2022 | 28.8 | 9 | 2.57x | 157% |
|---|---|---|---|---|
| 5/17/2022 – 6/16/2022 | 30.9 | 10 | 3.11x | 211% |
| 6/16/2022 – 7/18/2022 | 31.0 | 9 | 3.41x | 241% |
| 7/18/2022 – 8/16/2022 | 36.3 | 8 | 4.49x | 349% |
| 8/16/2022 – 9/15/2022 | 36.8 | 9 | 4.10x | 310% |
| 9/15/2022 – 10/17/2022 | 38.9 | 8 | 5.07x | 407% |
| 10/17/2022 – 11/15/2022 | 38.1 | 3 | 11.07x | 1007% |
| 11/15/2022 – 12/16/2022 | 41.6 | 6 | 6.58x | 558% |
| 12/16/2022 – 1/18/2023 | 45.0 | 9 | 5.29x | 429% |
| 1/18/2023 – 2/16/2023 | 45.3 | 10 | 4.74x | 374% |
| 2/16/2023 – 3/20/2023 | 47.6 | -5[42] | N/A | N/A |
| 3/20/2023 – 4/18/2023 | 47.7 | 0[43] | N/A | N/A |

74.     CleanChoice's rates were more than double ConEd's supply costs for 19 of 22 billing cycles and was ***over 11 times*** higher than ConEd's supply costs in October 2022.  For the first bill after Plaintiff Weinberg stopped buying his electricity from CleanChoice, his rate

---

[42] The February to March 2023 billing period is negative due to an overcharging in a prior month.  All calculations in this complaint take the net impact of this overcharging into account.

[43] The March to April 2023 billing period is slightly negative, rounding to zero, due to an overcharging in a prior month.  All calculations in this complaint take the net impact of this overcharging into account.

dropped from 47.7 cents per kilowatt hour to 5.7 cents per kilowatt hour, over **_eight times lower_** than CleanChoice's rate.

75.    National Grid and ConEd's electric supply costs, are a reasonable, pre-discovery benchmark of CleanChoice's supply costs. As explained above, National Grid and ConEd are CleanChoice's primary competitors in Plaintiffs' service territory, and their supply costs encompass the average wholesale price of electricity and associated costs over time (the same costs that ESCOs like CleanChoice incur) without any markup, making the utilities' procurement costs an ideal comparator.

76.    The disconnect between the local utilities' costs and CleanChoice's rates further demonstrates that CleanChoice's rates did not even remotely reflect Defendant's costs. For the Sudakows, between February 2022 and April 2022, National Grid's supply costs decreased from 10.8 cents per kWh to 5.2 cents per kWh, yet CleanChoice's rates increased from 16.3 cents per kWh to 22.3 cents per kWh. For Plaintiff Weinberg, from January 2022 to November of 2022, ConEd's supply costs fell from 16 cents per kWh to just 3 cents per kWh. CleanChoice's rates, meanwhile, rose from 26 cents per kWh to 38 cents per kWh.

77.    As illustrated by the rates CleanChoice charged Plaintiffs, CleanChoice's rates follow a "glide path" model. CleanChoice starts from an appealingly low teaser rate and then raises the variable rate in increasing increments so that customers are lured into inattentiveness and unlikely to notice that their energy bills have crept to stratospheric prices. This is a deceptive and unfair practice.

78.    CleanChoice did not adequately disclose to Plaintiffs that its variable electricity rates are consistently and significantly higher than the rates National Grid or ConEd charge. CleanChoice likewise failed to adequately disclose to Plaintiffs that in paying Defendant's

variable energy rates, they received no added material benefit at a dramatically higher price than if they had bought their energy from Plaintiffs' local utilities (even accounting for REC costs).

79.    No reasonable customer, including Plaintiffs, would expect an ESCO's variable rate to be artificially inflated beyond any resemblance to the local utility's costs. Indeed, the fact that CleanChoice's rates were *frequently* double or triple (and once *eleven* times higher) than the local utility's rates demonstrates the extent of its unscrupulous price gouging.

80.    CleanChoice knew that its variable rates were consistently and significantly higher than the local utility's rates.

81.    Defendant's failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

82.    Moreover, Defendant at no time alerted or informed Plaintiffs that the cost for electricity would be *continuously significantly* higher than the same electricity sold by National Grid or ConEd.

83.    CleanChoice lulled consumers into purchasing its energy supply via material omissions about its variable energy rates. Defendant did so to reap excessive profits at the expense of unsuspecting consumers. Defendant acted with actual malice, or wanton and willful disregard, for consumers' well-being.

84.    A comparison of CleanChoice's rates to prevailing market costs, including the cost to procure RECs, also demonstrates that CleanChoice does not charge a rate based on the factors it promised.

85.    The tables below, *see* ¶¶ 88–89, identify (i) the billing periods during which Plaintiffs were enrolled in CleanChoice's variable rate for electricity services, (ii) the variable

rate CleanChoice charged Plaintiffs, (iii) the corresponding "Market Supply Costs," and (iv) the differences between CleanChoice's rates and the contemporaneous Market Supply Costs ("CleanChoice's Multiplier").

86.    The Market Supply Costs below are based on the costs that ESCOs like CleanChoice incur supplying a retail customer in Plaintiffs' utility areas for each period, including the cost to procure RECs paired with one hundred percent of the electricity sold to that customer.  The Market Supply Costs include the weighted day-ahead NYISO prices in Plaintiffs' utility zone, ancillary services costs, capacity costs, RECs, and various relatively small charges related to the NYISO (all the same costs that CleanChoice identifies in its contract with Plaintiffs).  These charges are tracked by NYISO's Market Monitor, the external consultant that independently evaluates the New York wholesale electricity market.  NYISO's Market Monitor is appointed pursuant to NYISO's Federal Energy Regulatory Commission regulation and tariff.

87.    The Market Supply Costs represent the costs and market factors that determine the costs that CleanChoice and ESCOs incur in providing energy to retail customers.  Each of these measures reflects the costs that CleanChoice's competitors, in the regulated or deregulated markets, incur.  That CleanChoice's rates are so vastly different from the utilities costs or the Market Supply Costs demonstrate that CleanChoice's rates are not "based on" its actual costs as required by CleanChoice's contract.

88.    The following table represents the Sudakows' CleanChoice rates versus the Market Supply costs.  The Market Supply Costs column includes the costs and market factors that determine the costs of supplying energy plus the cost of purchasing RECs.  Therefore, the overcharge percentage and overcharge factor in the following table account for CleanChoice's purchase of RECs.

| Billing Period | CleanChoice Rate (Cents Per kWh) | Market Supply Costs (Cents per kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 1/7/2022 – 2/7/2022 | 13.7 | 13.9 | (1.02x) | (2)% |
| 2/7/2022 – 3/8/2022 | 16.3 | 10.4 | 1.17x | 17% |
| 3/8/2022 – 4/8/2022 | 18.8 | 7.0 | 1.80x | 80% |
| 4/8/2022 – 5/9/2022 | 22.3 | 6.6 | 3.17x | 217% |
| 5/9/2022 – 6/8/2022 | 25.2 | 6.4 | 3.83x | 283% |
| 6/8/2022 – 7/8/2022 | 29.3 | 9.1 | 4.58x | 358% |
| 7/8/2022 – 8/8/2022 | 31.8 | 10.9 | 3.48x | 248% |

89.     The following table represents Plaintiff Weinberg's CleanChoice Rates versus the Market Supply costs.  The Market Supply Costs column includes the costs and market factors that determine the costs of supplying energy plus the cost of purchasing RECs.  Therefore, the overcharge percentage and overcharge factor in the following table account for CleanChoice's purchase of RECs.

| Billing Period | CleanChoice Rate (Cents per kWh) | Market Supply Costs (Cents per kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| 6/16/2021 – 7/16/2021 | 17.8 | 8 | 2.18x | 118% |
| 7/16/2021 – 8/16/2021 | 17.1 | 8 | 2.04x | 104% |
| 8/16/2021 – 9/15/2021 | 19.5 | 9 | 2.26x | 126% |
| 9/15/2021 – 10/15/2021 | 20.3 | 9 | 2.14x | 114% |

| 10/15/2021 – 11/15/2021 | 20.3 | 10 | 2.08x | 108% |
|---|---|---|---|---|
| 11/15/2021 – 12/16/2021 | 24.0 | 9 | 2.59x | 159% |
| 12/16/2021 – 1/18/2022 | 24.1 | 12 | 1.93x | 93% |
| 1/18/2022 – 2/16/2022 | 26.3 | 18 | 1.50x | 50% |
| 2/16/2022 – 3/18/2022 | 26.1 | 10 | 2.56x | 156% |
| 3/18/2022 – 4/18/2022 | 26.1 | 10 | 2.70x | 170% |
| 4/18/2022 – 5/17/2022 | 28.8 | 10 | 2.74x | 174% |
| 5/17/2022 – 6/16/2022 | 30.9 | 12 | 2.67x | 167% |
| 6/16/2022 – 7/18/2022 | 31.0 | 11 | 2.84x | 184% |
| 7/18/2022 – 8/16/2022 | 36.3 | 15 | 2.38x | 138% |
| 8/16/2022 – 9/15/2022 | 36.8 | 14 | 2.72x | 172% |
| 9/15/2022 – 10/17/2022 | 38.9 | 10 | 3.88x | 288% |
| 10/17/2022 – 11/15/2022 | 38.1 | 8 | 4.85x | 385% |
| 11/15/2022 – 12/16/2022 | 41.6 | 11 | 3.92x | 292% |
| 12/16/2022 – 1/18/2023 | 45.0 | 12 | 3.64x | 264% |
| 1/18/2023 – 2/16/2023 | 45.3 | 8 | 5.35x | 435% |
| 2/16/2023 – 3/20/2023 | 47.6 | 7 | 6.90x | 590% |
| 3/20/2023 – 4/18/2023 | 47.7 | 6 | 7.62x | 662% |

90.     As these tables show, CleanChoice's variable rates are consistently and substantially higher than a rate based on the market supply costs, which further demonstrates that CleanChoice's rates are not set in accordance with its costs.

91.     The Sudakows' CleanChoice rates are higher than the Market Supply Costs 6 of 7 months and are on average an overcharge of 2.72 times (172% overcharge) the Market Supply Costs.  Mr. Weinberg's rates are higher than Market Supply Costs for all months of data available to Plaintiffs and average an overcharge of 2.98 times (198% overcharge) the Market Supply costs.

92.     As with the comparison to National Grid's supply costs, the rates CleanChoice charged the Sudakows likewise fail to fluctuate in accordance with Market Supply Costs.  For instance, when the Market Supply Costs steadily declined from 10.4 cents per kWh to 6.4 cents per kWh between February 2022 and June 2022 (declining 38%), CleanChoice's variable rate rose from 16.3 cents per kWh to 25.2 cents per kWh (rising 55%).

93.     Similarly, Mr. Weinberg's CleanChoice rates increased steadily to a staggering high of 47.7 cents per kWh while the Market Supply costs fluctuated between a low of 6 cents per kWh (the same month as CleanChoice's highest charges) and a high of 15 cents per kWh during the same period.

94.     The cost of wholesale electricity is the primary component of the non-overhead costs CleanChoice incurs.  As explained above, the other cost factors that may affect its variable rate (such as capacity, ancillaries, transmission costs, transportation costs, and line losses) are included in National Grid and ConEd's supply costs as well.  These additional wholesale costs are relatively insignificant in terms of the overall costs Defendant incurs to provide retail electricity, and do not substantially fluctuate over time.  Moreover, other ESCOs incur these

costs as well, yet they offer substantially lower rates. Nor does the cost of purchasing RECs corresponding to 100% of Plaintiffs' electricity supply explain CleanChoice's exorbitant rates.

95.     Therefore, Defendant's non-overhead cost factors cannot explain Defendant's egregiously high variable rate or the reason its rates are disconnected from changes in wholesale costs. CleanChoice's overhead costs (which are relatively minor compared to electricity costs) also cannot explain the high variable rates charged, as CleanChoice's own fixed rates, which are significantly lower than its variable rates, demonstrate.

96.     Indeed, CleanChoice routinely charges its customers variable rates for electricity that are amongst the highest offered by ESCOs in New York. According to data from the U.S. Energy Information Administration, CleanChoice charged it customers the eleventh highest price of 63 ESCOs in New York in 2018, the twelfth highest price of 69 ESCOs in New York in 2019, the fourteenth highest price of 64 ESCOs in New York in 2020, and the fifth highest price of 66 ESCOs in New York in 2021.[44] CleanChoice's variable rates are also far higher than the average ESCO rate for electricity, with rates that were 30% higher than average in 2018, 31% higher than average in 2019, 25% higher than average in 2020, and 53% higher than average in 2021.[45] These other ESCOS have similar costs and overhead expenses to those CleanChoice incurs.

97.     Defendant's ability to make a profit does not justify its outrageously high rates. A reasonable consumer might understand that an ESCO will attempt to make a reasonable profit by selling consumers retail electricity. However, such a consumer would also expect that such profits would be consistent with profit margins obtained by other suppliers of electricity in their

---

[44] *See* Electric Sales, Revenue, and Average Price, U.S. Energy Information Administration, Table 12, https://www.eia.gov/electricity/sales_revenue_price/ (last visited Nov. 2, 2023).

[45] *See id.*

respective markets and that Defendant's profiteering at the expense of its customers would not be
so extreme that its rate bears no relation to a rate based on costs but is instead outrageously
higher.

98.    CleanChoice also obtained customers by misleading them about the nature of the
energy it was supplying.

99.    The direct mail marketing solicitation included with the mailer CleanChoice sent
to the Sudakows contained several false, deceptive, and misleading representations. *See* Ex. A at
3–4.  Upon information and belief, these or substantially similar marketing materials were sent to
Plaintiff Wienberg and all other Class Members.

100.    In the CleanChoice marketing materials attached to the "CLEAN ENERGY
AUTHORIZATION FORM," Defendant sent to the Sudakows, CleanChoice represented that
customers who switched would get "**100% clean, pollution-free energy**." *Id.* at 4 (emphasis in
original).  This statement is false and deceptive because the energy actually supplied by
CleanChoice and delivered to customers is not 100% clean and 100% pollution free.  Instead, the
actual energy supplied to CleanChoice customers' meter is the same "brown" energy the
customer would get if supplied by the utility.  The only difference is that CleanChoice purports
to also purchase RECs to offset the "brown" energy the customer actually uses.  However, the
purchase of RECs does not make the "brown" energy supplied to CleanChoice customers' meter
100% clean or 100% pollution free.  The more CleanChoice energy a customer uses, the more
pollution they create.

101.    The "Frequently Asked Questions About Switching to Clean Energy"
CleanChoice sent to the Sudakows answers the question of "**[w]here will the clean energy come
from?**" (emphasis in original) with the statement that "[w]hen you choose clean energy, [the

utility] will get your energy from an eligible energy supplier, CleanChoice Energy" and
"CleanChoice Energy will source wind and solar power from farms in your region."  *Id.* at 3.
This statement is false and deceptive because the energy actually supplied by CleanChoice is not
"wind and solar power from farms in your region."  Instead, the actual energy supplied to
CleanChoice customers' meters is the same "brown" energy the customer would get if supplied
by the utility.  The only difference is that CleanChoice purports to also purchase RECs to offset
the customer's brown energy usage.  However, the purchase of RECs does not mean the "brown"
energy supplied to CleanChoice customers' meters "come[s] from" or is "source[d]" by wind
and solar power from farms in the region.

      102.    On the "CLEAN ENERGY AUTHORIZATION FORM" itself CleanChoice
represented that signing up for CleanChoice meant the customer would be "**obtain[ing] your
electricity from renewable sources provided by CleanChoice Energy**."  *Id.* at 4 (emphasis in
original).  This statement is false and deceptive because the energy "provided by CleanChoice
Energy" is not "from" renewable sources.  The energy "provided by CleanChoice Energy" is
brown energy and CleanChoice then purchases RECs.  As the NYPSC staff made clear, "[t]he
fuel mixes of electricity purchased on the spot market cannot be disaggregated, meaning that an
ESCO cannot 'divert' the renewable portion of the spot market electricity to some customers,
while serving other customers with the electricity" and that "in almost every instance, a customer
who switches from the utility to an ESCO is likely to receive the same or less renewable energy
than they were receiving from the utility, even if they are sold a "green" commodity product."[46]
CleanChoice customers are not "obtain[ing] [their] electricity from renewable sources provided

---

[46] NYPSC, CASE 12-M-0476, Department of Public Service Staff Unredacted Initial Brief, at
69–70 (Mar. 30, 2018).

by CleanChoice Energy."  Rather, they are getting the same brown energy they would have gotten from the utility.  CleanChoice's purchase of RECs does not mean that customers are somehow "obtain[ing] [their] electricity from renewable sources provided by CleanChoice Energy."

103.    The "Frequently Asked Questions About Switching to Clean Energy" answers the question of "**[h]ow is renewable energy different?**" (emphasis in original) with the statement that "[r]enewable energy is produced from wind and solar sources" and "[u]nlike conventional electricity sources, renewable sources do not produce carbon dioxide or contribute to air pollution." *Id.* at 3.  This statement is deceptive because when combined with CleanChoice's other representations about the nature of the electricity it sells (such as that it sells "100% clean, pollution-free energy," that CleanChoice's energy is "from" renewable sources, and that "CleanChoice Energy will source wind and solar power from farms in your region"), this statement falsely suggests that the electricity CleanChoice sells "is produced from wind and solar sources" and that the electricity customers buy from CleanChoice "do[es] not produce carbon dioxide or contribute to air pollution."  The truth is that CleanChoice sells the same "brown" energy the customer would get if supplied by the utility paired with RECs.  The brown energy CleanChoice supplies is not solely produced from wind and solar sources and use of CleanChoice's energy does produce carbon dioxide and does contribute to air pollution.

104.    In this case, CleanChoice knew that once it had acquired the consumer's energy account, it could charge high energy rates and many consumers (if not most) would not know, and simply pay the exorbitant charges, month after month.

105.    It is well-established that defaults are powerful drivers of consumer behavior.  There are various factors underlying this human tendency that have been discussed in

the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[47] and "Nudges."[48]

106.    The fact that CleanChoice charges fixed rates (which also includes RECs) that are substantially lower than its variable rates also proves that the costs, expenses, and margins CleanChoice incurs cannot justify its exorbitant variable rates.  CleanChoice's fixed rates are always substantially lower than its variable rates; after all, that is how CleanChoice attracts customers in the first place.  CleanChoice incurs the same costs, expenses, and margins to supply its fixed rate customers as it incurs for its variable rate customers.

107.    Defendant's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that consumers will compare CleanChoice's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective.  As the NYPSC has observed, "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service through an ESCO."[49]

108.    Given that Defendant has engaged in a series of deceptive acts and omissions for which it billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of CleanChoice's last wrongful act against Plaintiffs, which was in April of 2023, when CleanChoice last charged Plaintiff Weinberg substantially more for electricity than the local utility.

---

[47] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[48] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

[49] CASE 12-M-0476, Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets, at 11 (Feb. 25, 2014).

**C.     CleanChoice Violated New York's Variable Rate Disclosure Law**

109.    Because of the New York Legislature's concerns with skyrocketing variable rates, New York adopted N.Y. GEN. BUS. LAW § 349-d(7), which requires that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified."

110.    Through their conduct, CleanChoice violated both the spirit and letter of N.Y. GEN. BUS. LAW § 349-d, the law that is explicitly designed to allow energy consumers to make informed choices: "These provisions will go a long way toward restoring an orderly marketplace where consumers can make informed decisions on their choices for gas and electric service . . . ."[50]

111.    CleanChoice's marketing materials that it mailed directly to Plaintiffs never clearly and conspicuously identified that it would be charging its consumers a variable rate. Specifically, the marketing material attached to the "CLEAN ENERGY AUTHORIZATION FORM" does not mention that CleanChoice will charge its customers a variable rate.  In fact, the word "variable" does not appear anywhere in this marketing material.

112.    Likewise, the "Frequently Asked Questions About Switching to Clean Energy" do not mention that that CleanChoice will charge its customers a variable rate.  In fact, the word "variable" does not appear anywhere in this marketing material.

**D.     CleanChoice's Documented History of Deceptive Business Practices**

113.    CleanChoice has a long record using deceptive marketing and sales practices, which a 2022 investigative report describes as "a disturbing pattern of behavior" built upon "a

---

[50] Exhibit C, New York Sponsors Memo at 4.

fundamentally misleading for-profit business model that capitalizes on a lack of popular understanding about how electrical grids operate."[51]

114.    Indeed, just this year, CleanChoice paid $600,000 in a settlement[52] with the staff of the Illinois Commerce Commission and two consumer advocacy organizations that alleged that "CleanChoice asks customers to pay a premium for grid power matched with Renewable Energy Credits (RECs), but fails to provide critical information, such as what type of RECs are being offered, where the RECs were generated, and the 'price to compare' (the default utility's current supply price).  Without this information, customers cannot evaluate the costs and benefits of these offers."[53]

115.    CleanChoice's practices have also caught the attention of other state and local officials over the years.  For example, in 2017, the Town of Acton, Massachusetts alerted the Massachusetts Department of Public Utilities that CleanChoice was running "a misleading marketing campaign," by sending advertisements to residents and "creating the impression that it is a government communication."[54]

---

[51] William Bredderman, *Critics Say CleanChoice Energy, Founded By Political Operatives, Targets Eco-Conscious Consumers With Misleading Promotions*, The Daily Beast, Mar. 29, 2022, *available at* https://www.thedailybeast.com/cleanchoice-energy-is-the-sneaky-green-energy-company-that-pisses-off-climate-do-gooders (last visited Nov. 2, 2023).

[52] Settlement Agreement, *Environ. Law & Policy Cen. v. CleanChoice Energy, Inc.*, No. 20-0499 (Illinois Commerce Commission Feb. 21, 2023), *available at* https://www.icc.illinois.gov/docket/P2020-0499/docket-sheet (last visited Nov. 2, 2023).

[53] Verified Formal Complaint at 2, *Environ. Law & Policy Cen. v. CleanChoice Energy, Inc.*, No. 20-0499 (Ill. Comm. Comm'n May 29, 2020), *available at* https://www.icc.illinois.gov/docket/P2020-0499/docket-sheet (last visited Nov. 2, 2023).

[54] Letter to Mass. Dep't of Pub. Utils., Aug. 4, 2017, *available at* https://www.actonma.gov/DocumentCenter/View/3921/Letter-of-Complaint---Mass-Dept-Public-Utilities?bidId= (last visited Nov. 2, 2023).

116.    In 2016, CleanChoice (then operating under the name "Ethical Electric")[55] entered into an Assurance of Voluntary Compliance ("AVC") with the Illinois Attorney General in a matter that alleged that CleanChoice improperly marketed its electricity as "green" when it was really just supplying "brown" energy paired with the use of RECs as offsets, and that it claimed its price was comparable to the local utility when it was "routinely more than 5 percent higher."[56] Specifically, the Illinois Attorney General's action stemmed from CleanChoice's direct mail solicitations promoting its "Clean Energy Option" product as powering customers' homes with electricity generated exclusively from renewable energy sources like wind and solar. In truth, however, the electricity provided was simply electricity from the electric grid that was then paired with RECs.  As part of the AVC, CleanChoice agreed to make $3 million available to customers.[57]

117.    And in 2015, CleanChoice (again operating under the "Ethical Electric" name) entered into an AVC with the Pennsylvania Attorney General for misleading customers into thinking its advertisements were from the local utility, rather than from an ESCO.[58]  The AVC required CleanChoice to cease its misleading advertising practices.[59]

---

[55] Press Release, *Ethical Electric Is Now CleanChoice Energy*, Oct. 31, 2016, *available at* https://cleanchoiceenergy.com/news/cleanchoice_energy_announcement (last viewed Nov. 2, 2023).

[56] Press Release, *Madigan Reaches Settlement With Ethical Electric For Misleading Marketing About Its Renewable Energy Product*, Ill. Att'y Gen. (Aug. 8, 2016), *available at* https://ag.state.il.us/pressroom/2016_08/20160808b.html (last visited Nov. 2, 2023).

[57] *Id.*

[58] Myles Snyder, *AG:  Ethical Electric Misled Consumers*, ABC27.COM, June 11, 2015, *available at* https://www.abc27.com/news/ag-ethical-electric-misled-consumers/ (last visited Nov. 2, 2023); *see also CleanChoice Energy, Inc. Renewal Application for Competitive Electric Power Supplier License* ¶ 16, N.H. Public Utils. Comm'n, Feb. 13, 2017, *available at* https://www.puc.nh.gov/regulatory/Docketbk/2017/17-028/INITIAL%20FILING%20-%20PETITION/17-028_2017-02-14_CCE_RENEWAL_REG_CEPS.PDF (last visited Nov. 2, 2023).

[59] *Id.*

118.    The complaint statistics for CleanChoice tell a similar story.  The New York Office of Consumer Services ("OCS") monitors the number and types of complaints received against ESCOs operating in New York.[60]  OCS divides the complaints into "initial complaints" and "escalated complaints."  Initial complaints are all complaints first submitted to OCS.  If those complaints are not addressed by the ESCO, they require further investigation by OCS and are categorized as escalated complaints.  OCS kept a record of the number of complaints for 82 ESCOs in 2022 and for 2023 as of September.  In 2022, CleanChoice had the second most initial complaints brought against it out of all 82 ESCOs.[61]  Thus far in 2023, CleanChoice has had the most initial complaints brought against it out of all 82 ESCOs.[62]  Out of all 82 ESCOs, CleanChoice had the second most escalated complaints brought against it in 2022 and is currently tied for the second most escalated complaints brought against it in 2023.[63]  Comparing the number of complaints to OCS brought against all ESCOs in New York, CleanChoice had:  (i) over *17 times* the median number of initial complaints brought against it in 2022; (ii) *12 times* the median number of initial complaints brought against it thus far in 2023; (iii)  *14 times* the median number of escalated complaints brought against it in 2022; and (iv) *6 times* the median number of escalated complaints brought against thus far in 2023.[64]

---

[60] Department of Public Service, Office of Consumer Services, *Monthly Report on Consumer Complaint Activity*, September 2023, *available at* https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=19-00950&submit=Search (last visited Nov. 2, 2023).

[61] *Id.* at 15–17.

[62] *Id.*

[63] *Id.*

[64] *See id.*

## CLASS ACTION ALLEGATIONS

119.     Plaintiffs bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all CleanChoice customers in the United States who were charged for electricity services by CleanChoice from the earliest allowable date through the date of judgment (the "Class").

120.     Plaintiffs also bring this action on their own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all New York CleanChoice customers in the United States who were charged for electricity services by CleanChoice from the earliest allowable date through the date of judgment (the "New York Subclass").

121.     As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendant.  Defendant has engaged in uniform and standardized conduct toward the Class—its marketing and billing practices—and this case is about the responsibility of Defendant for its knowledge and conduct in deceiving its customers.  This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in its omissions.  Upon information and belief, the variable rate provisions in the customer agreements for all of CleanChoice's customers (the "Class Members") are materially the same.

122.     Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

123.    Plaintiffs reserve the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiffs file their motion for class certification.

124.    Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of CleanChoice.  Plaintiffs believe, however, that based on the publicly available data concerning Defendant's customers in the United States, the Class encompasses at least one hundred thousand individuals whose identities can be readily ascertained from Defendant's records.  Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

125.    The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within its control. Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

126.    Plaintiffs are adequate class representatives.  Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by the Defendant.  Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

127.    Plaintiffs will fairly and adequately protect the interests of all Class Members. Plaintiffs have retained competent and experienced class action attorneys to represent their interests and those of the Class.

128.    Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a.    Whether Defendant's misrepresentations and omissions are materially misleading;

      b.    Whether Defendant breached its contract with Plaintiffs and Class Members by failing to set variable rates in the method dictated by the parties' contract;

      c.    Whether Defendant's conduct violates various state consumer protection statutes;

      d.    Whether Defendant was unjustly enriched as a result of its conduct;

      e.    Whether Defendant violated the duty of good faith and fair dealing in its consumer contracts;

      f.    Whether Class Members have been injured by Defendant's conduct;

      g.    Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

      h.    The extent of class-wide injury and the measure of damages for those injuries.

129.    A class action is necessary because i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct.

130.    A class action is appropriate because Defendant has acted or refused to act on grounds generally applicable to all Class Members.

131.     A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

132.     Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a) and 23(b).

## CAUSES OF ACTION

### COUNT I
### Breach Of Contract
### (On Behalf Of Plaintiffs And The Class)

133.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

134.     CleanChoice customers have customer agreements whose variable rate terms are substantially similar.

135.     Plaintiffs and the Class entered into valid contracts with Defendant for the provision of electricity.

136.     CleanChoice uniformly represents to its New York customers that its variable rates for electricity "may vary each month and is based on a number of costs which may include, but are not limited to energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system fees and other factors, plus CleanChoice Energy operating costs, expenses, and margins."

137.     Upon information and belief, Plaintiffs were subject to the same contractual terms for their variable rate for electricity as the other customers in New York, which is substantially

similar to the variable rate contractual terms for all CleanChoice customers in New Jersey, Pennsylvania, Delaware, Ohio, Maryland, Washington, D.C., and Illinois.

138.    Pursuant to the contracts, Plaintiffs and the Class paid the variable rates Defendant charged for electricity.

139.    However, Defendant failed to perform its obligations under its contracts to charge rates based upon the costs and factors identified in the contract.  Instead, Defendant charged variable rates for electricity that were untethered from the factors upon which the parties agreed the rate would be based.

140.    Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Defendant based its rate on the costs and factors identified in the contract.

141.    By reason of the foregoing, Defendant is liable to Plaintiffs and other Class Members for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## COUNT II
### Breach Of The Implied Covenant Of Good Faith And Fair Dealing
### (In The Alternative, On Behalf Of Plaintiffs And The Class)

142.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

143.    Plaintiffs and the Class contracted with Defendant for the provision of electricity supply.

144.    Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

145.    Under the contract, to the extent Defendant had discretion to set the variable rate for electricity, it was obligated to exercise its discretion in good faith.  Defendant exercised its discretion in bad faith.  Specifically, Defendant acted with a bad motive and continued to gouge customers.

146.    Plaintiffs reasonably expected that CleanChoice's variable energy rates would not be continuously and significantly higher than its actual costs plus a commercially reasonable margin or than the utility's rates (even accounting for REC costs), which otherwise provide the same energy supply as CleanChoice.  Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy electricity from Defendant.

147.    Plaintiffs also reasonably expected that Defendant would refrain from price gouging. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy electricity from Defendant.  Defendant knew it was engaging in price gouging and nevertheless extracted unreasonable and excessive margins from its variable rate customers.

148.    Defendant breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiffs' and other Class Members' reasonable expectations that Defendant's variable energy rate would be commensurate with its costs plus a commercially reasonable margin.

149.    As a result of Defendant's breaches, CleanChoice is liable to Plaintiffs and members of the Class for damages and attorney's fees and expenses.

<u>COUNT III</u>
**Violation Of New York General Business Law § 349**
**(On Behalf Of Plaintiffs And The New York Subclass)**

150.   Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

151.   Plaintiffs bring this claim under N.Y. GEN. BUS. LAW § 349 on their own behalf and on behalf of each member of the New York Subclass.

152.   New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. GEN. BUS. LAW § 349.

153.   Defendant's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

154.   Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW § 349, including:

  a.   Misrepresenting in its form customer contract the basis upon which its variable rates are set;

  b.   Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

  c.   Failing to adequately disclose that Defendant's costs to purchase RECs are minimal compared with its electricity procurement costs and that REC costs do not justify Defendant charging rates that are dramatically higher than the local utility's rates;

  d.   Failing to adequately disclose the variable rate methodology CleanChoice used to calculate its variable rates to enable consumers to potentially compare prices;

  e.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

f.  Using a "glide path" practice to lull customers into not noticing that CleanChoice was engaging in price gouging by charging a rate based on a commercially unreasonable margin;

g.  Misrepresenting to customers that it provided "100% clean, pollution-free energy;"

h.  Misrepresenting to customers that "CleanChoice Energy will source wind and solar power from farms in your region" to supply customers with electricity;

i.  Misrepresenting to customers that, by signing up with CleanChoice, customers would be "obtain[ing] your electricity from renewable sources provided by CleanChoice Energy;" and

j.  Deceptively advertising to customers that "[r]enewable energy is produced from wind and solar sources" and "[u]like conventional electricity sources, renewable sources do not produce carbon dioxide or contribute to air pollution," when in fact CleanChoice supplied the same brown energy as the utility.

155.   The above deceptive practices and acts by CleanChoice were material misrepresentations or omissions of existing or past facts.

156.   Defendant knew or believed that the above unfair and deceptive practices and acts were affirmative false statements and/or material omissions.

157.   The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to the public policy of New York, which aims to protect consumers.

158.   Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase electricity from CleanChoice.

159.   Each of Defendant's contracts include a three-day rescissionary period. During the rescissionary period, Defendant's contract serves as a solicitation because consumers may "cancel" the agreement before it becomes legally binding upon the expiration of the rescissionary period (rendering the contract illusory during this period). Thus, the contract is an

advertisement in which Defendant misrepresents that the variable energy rates will be based upon the costs and factors identified. Defendant also knew that its variable rate is not in fact based on its costs, expenses and commercially reasonable margins.

160.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing CleanChoice.

161.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to CleanChoice was the customer's local utility.

162.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers that CleanChoice variable rates for electricity were consistently and substantially higher than Plaintiffs' and prospective customers' local utility rate. CleanChoice also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

163.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers that Defendant's costs to purchase RECs are minimal compared with its electricity procurement costs and that REC costs do not justify Defendant charging rates that are dramatically higher than the local utility's rates. CleanChoice also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

164.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers that CleanChoice had failed to disclose the actual methodology CleanChoice used to calculate its variable rates in a way that would allow a reasonable person to potentially compare prices. CleanChoice also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

165.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers what conditions must be present for a CleanChoice variable rate customer to save money compared to what the customer's local utility would have charged.  CleanChoice also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

166.    Defendant's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in Paragraph 154 above, CleanChoice deprived customers of the ability to make informed purchasing decisions.

167.    Defendant's practices are unconscionable and outside the norm of reasonable business practices.

168.    As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiffs and Class Members switched to and remained with CleanChoice and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a rate based on its costs, as well as the difference in CleanChoice's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting electricity supply from Defendant.  Plaintiffs and Class Members also suffered and continue to suffer an ascertainable loss of monies based on the difference in the rates they were charged for CleanChoice's deceptively marketed electricity versus the rate its brown electricity paired with RECS was actually worth.  By reason of the foregoing, Defendant is liable to Plaintiffs and Class Members for compensatory damage or statutory damages (whichever is greater), attorneys' fees, and the costs of this suit.

169.     Plaintiffs and the members of the Class further seek equitable relief against Defendant.  Pursuant to N.Y. GEN. BUS. LAW § 349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

170.     As a result of Defendant's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under N.Y. GEN. BUS. LAW § 349.

**COUNT IV**
**Violation Of New York General Business Law § 349-d(3)**
**(On Behalf Of Plaintiffs And The New York Subclass)**

171.     Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

172.     Plaintiffs bring this claim under N.Y. GEN. BUS. LAW § 349-d on their own behalf and on behalf of each member of the New York Subclass.

173.     N.Y. GEN. BUS. LAW §349-d(3) provides that "[n]o person who sells or offers for sale any energy services for, or on behalf of, an ESCO shall engage in any deceptive acts or practices in the marketing of energy services."

174.     Defendant offers for sale energy services for and on behalf of an ESCO.

175.     Defendant engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. GEN. BUS. LAW §§ 349-d(3) as described above, and including:

a.  Misrepresenting in its form customer contract the basis upon which its variable rates are set;

b.  Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

c.  Failing to adequately disclose that Defendant's costs to purchase RECs are minimal compared with its electricity procurement costs and that REC costs do not justify Defendant charging rates that are dramatically higher than the local utility's rates;

d.  Failing to adequately disclose the variable rate methodology CleanChoice used to calculate its variable rates to enable consumers to potentially compare prices;

e.  Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

f.  Using a "glide path" practice to lull customers into not noticing that CleanChoice was engaging in price gouging by charging a rate based on a commercially unreasonable margin;

g.  Misrepresenting to customers that it provided "100% clean, pollution-free energy."

h.  Misrepresenting to customers that "CleanChoice Energy will source wind and solar power from farms in your region" to supply customers with electricity;

i.  Misrepresenting to customers that, by signing up with CleanChoice, customers would be "obtain[ing] your electricity from renewable sources provided by CleanChoice Energy;" and

j.  Deceptively advertising to customers that "[r]enewable energy is produced from wind and solar sources" and "[u]like conventional electricity sources, renewable sources do not produce carbon dioxide or contribute to air pollution," when in fact CleanChoice supplied the same brown energy as the utility.

176.    Defendant's acts are willful, unfair, unconscionable, deceptive, and contrary to the public policy of New York, which aims to protect energy consumers.

177.    As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiffs and the New York Subclass members have suffered injuries and monetary damages in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees.

178.    Plaintiffs also seek an Order enjoining Defendant from undertaking any further unlawful conduct, pursuant to N.Y. GEN. BUS. LAW § 349-d(10).

**COUNT V**
**Violation Of New York General Business Law § 349-d(7)**
**(On Behalf Of Plaintiffs And The New York Subclass)**

179.    Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

180.    Plaintiffs bring this claim under N.Y. GEN. BUS. LAW § 349-d(7) on their own behalf and on behalf of each member of the New York Subclass.

181.    Section 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified." N.Y. GEN. BUS. LAW § 349-d(7).

182.    The marketing materials CleanChoice provided to Plaintiffs fail to clearly and conspicuously disclose that Plaintiffs will be charged variable rates.

183.    Specifically—and as admitted by CleanChoice—CleanChoice sent a "direct mail marketing solicitation" to Plaintiffs, which included "an FAQ page" and "a detachable letter of authorization." CleanChoice's General Counsel, Jennifer L. Spinosi, made these admissions to the New York Attorney General in a letter dated March 16, 2023.

184.    The FAQ page and the letter of authorization constitute independent "marketing materials" under Section 349-d(7).

185.    Neither the FAQ page nor the letter of authorization mention that CleanChoice will charge its customers a variable rate.  In fact, the word "variable" does not appear anywhere in these marketing materials.

186.    Through its conduct described above, CleanChoice has violated N.Y. GEN. BUS. LAW § 349-d(7) and has caused injury to Plaintiffs and CleanChoice's other variable rate customers in New York.

187.    Under N.Y. GEN. BUS. LAW § 349-d(10), Plaintiffs have a private right of action to enforce N.Y. GEN. BUS. LAW § 349-d(7).  As a direct and proximate result of CleanChoice's conduct, Plaintiffs and the New York Subclass have suffered injury and monetary damages in an amount to be determined at the trial of this action but not less than $500 for each violation, such damages to be trebled, plus attorneys' fees.

188.    Plaintiffs also seek an Order enjoining Defendant from undertaking any further unlawful conduct, pursuant to N.Y. GEN. BUS. LAW § 349-d(10).

## <u>COUNT VI</u>
### Violation Of Materially Identical State Consumer Protection Statutes
### (On Behalf Of Plaintiffs And The Class)

189.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

190.    Pursuant to the materially identical consumer protection statutes of New York, New Jersey, Pennsylvania, Delaware, Ohio, Maryland, Washington, D.C., and Illinois, consumers are protected against deceptive acts or practices, misrepresentations, or omissions which affect business, trade, or commerce.

191.    CleanChoice violated at least the following materially identical statutes:

    a.  New York General Business Law § 349;

    b.  New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2;

    c.  Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4);

    d.  Delaware Consumer Fraud Act, 6 Del. C § 2513;

    e.  Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.02, .03;

    f.  Maryland Consumer Protection Act, Md. Commercial Law Code Ann. § 13-303, *et seq.*;

    g.  District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3904, *et seq.*; and

    h.  Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS § 505/2.

192.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

193.    Defendant's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

194.    Defendant has engaged in, and continues to engage in, deceptive acts and practices, including:

    a.  Misrepresenting in its form customer contract the basis upon which its variable rates are set;

    b.  Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

    c.  Failing to adequately disclose that Defendant's costs to purchase RECs are minimal compared with its electricity procurement costs and that

56

REC costs do not justify Defendant charging rates that are dramatically higher than the local utility's rates;

d. Failing to adequately disclose the variable rate methodology CleanChoice used to calculate its variable rates to enable consumers to potentially compare prices;

e. Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged;

f. Using a "glide path" practice to lull customers into not noticing that CleanChoice was engaging in price gouging by charging a rate based on a commercially unreasonable margin;

g. Misrepresenting to customers that it provided "100% clean, pollution-free energy;"

h. Misrepresenting to customers that "CleanChoice Energy will source wind and solar power from farms in your region" to supply customers with electricity;

i. Misrepresenting to customers that, by signing up with CleanChoice, customers would be "obtain[ing] your electricity from renewable sources provided by CleanChoice Energy;" and

j. Deceptively advertising to customers that "[r]enewable energy is produced from wind and solar sources" and "[u]like conventional electricity sources, renewable sources do not produce carbon dioxide or contribute to air pollution," when in fact CleanChoice supplied the same brown energy as the utility.

195. The above unfair and deceptive practices and acts by CleanChoice were material omissions of existing or past facts.

196. Defendant knew or believed that the above unfair and deceptive practices and acts were material omissions and affirmative false statements.

197. The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to each state's public policy, which aims to protect consumers.

198.    Defendant's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase electricity from CleanChoice.

199.    Each of Defendant's contracts include a rescissionary period. During the rescissionary period, Defendant's contract serves as a solicitation because consumers may "cancel" the agreement before it becomes legally binding upon the expiration of the rescissionary period (rendering the contract illusory during this period). Thus, the contract is an advertisement in which Defendant misrepresents that the variable energy rates will be based upon the costs and factors identified. Defendant also knew that its variable rate is not in fact based on its costs, expenses and commercially reasonable margins.

200.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing CleanChoice.

201.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to CleanChoice was the customer's local utility.

202.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers that CleanChoice variable rates for electricity were consistently and substantially higher than Plaintiffs' and prospective customers' local utility rate. CleanChoice also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

203.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers that Defendant's costs to purchase RECs are minimal compared with its electricity procurement costs and that REC costs do not justify Defendant charging rates that are dramatically higher than the local utility's rates. CleanChoice also knew that this information was not readily

available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

204.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers that CleanChoice had failed to disclose the actual methodology CleanChoice used to calculate its variable rates in a way that would allow a reasonable person to potentially compare prices. CleanChoice also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

205.    CleanChoice knew at the time it signed up Plaintiffs and prospective customers what conditions must be present for a CleanChoice variable rate customer to save money compared to what the customer's local utility would have charged.  CleanChoice also knew that this information was not readily available to its customers and knew that its customers were acting on the basis of mistaken knowledge.

206.    Defendant's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers.   By making the material omissions outlined in paragraph 194 above, CleanChoice deprived customers of the ability to make informed purchasing decisions.

207.    Defendant's practices are unconscionable and outside the norm of reasonable business practices.

208.    As a direct and proximate result of Defendant's unlawful deceptive acts and practices, Plaintiffs and Class Members switched to and remained with CleanChoice and suffered and continue to suffer an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a rate based on its costs, as well as the difference in CleanChoice's variable rate and the default rate

utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting electricity supply from Defendant.  Plaintiffs and Class Members also suffered and continue to suffer an ascertainable loss of monies based on the difference in the rates they were charged for CleanChoice's deceptively marketed electricity versus the fair market value of the electricity CleanChoice actually delivered.  By reason of the foregoing, Defendant is liable to Plaintiffs and Class Members for compensatory damage or statutory damages (whichever is greater), attorneys' fees, and the costs of this suit.

209.    Plaintiffs and the members of the Class further seek equitable relief against Defendant.  This Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

210.    As a result of Defendant's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs, and reasonable attorneys' fees and all other relief available under each state's respective consumer protection statute.

<u>**COUNT VII**</u>
**Unjust Enrichment**
**(In The Alternative, On Behalf Of Plaintiffs And The Class)**

211.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

212.    This cause of action is pleaded in the alternative to Plaintiffs' contract claims.  To the extent the Court determines that a valid contract exists between the parties, Plaintiffs do not intend to proceed with their unjust enrichment claim.

213.    Plaintiffs and the Class Members conferred a tangible economic benefit upon Defendant by contracting with Defendant for electricity.  Plaintiffs and the Class would not have contracted with Defendant for electricity had they known that Defendant would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

214.    Plaintiffs and the Class Members would not have purchased energy from Defendant had they known the truth about Defendant's variable energy rates.

215.    By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and Class Members.

216.    It would be unjust and inequitable for Defendant to retain the payments Plaintiffs and Class Members made for excessive energy charges.

217.    Therefore, Defendant is liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Defendant's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)    Issue an order certifying the Classes defined above, appointing the Plaintiffs as Class Representatives, and designating the undersigned firms as Class Counsel;

(b)    Find and declare that Defendant CleanChoice has committed the violations of law alleged herein;

(c)    Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

(d)    Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

(e)     Render an award of punitive damages;

(f)     Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

(g)     Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demands that a jury determine any issue triable of right.

## NOTICE TO ATTORNEY GENERAL AND OTHER GOVERNMENT OFFICIALS

A copy of this Complaint will be electronically mailed to the Attorney General of the State of New Jersey within twenty-four hours of its filing, pursuant to N.J.S.A. § 56:8-20.

A copy of this Complaint will be mailed to the Attorney General of the State of Illinois pursuant to 815 I.L.C.S § 505/10a(d).

Dated: November 2, 2023
New York, New York

**WITTELS MCINTURFF PALIKOVIC**

By:     */s/ J. Burkett McInturff*
        J. Burkett McInturff
        Daniel J. Brenner
        305 BROADWAY, FLOOR 7
        NEW YORK, NEW YORK 10007
        Telephone: (914) 775-8862
        jbm@wittelslaw.com
        djb@wittelslaw.com

**FINKELSTEIN, BLANKINSHIP, FREI-PEARSON & GARBER, LLP**

D. Greg Blankinship
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

*Attorneys for Plaintiffs and the Proposed Class*