UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ERIC WEINBERG, ROBERT SUDAKOW, and
JOANNE SUDAKOW,

                   Plaintiffs,

          -v-

CLEANCHOICE ENERGY, INC.,

                  Defendant.

**<u>OPINION AND ORDER</u>**

23-CV-09685 (PMH)

---

PHILIP M. HALPERN, United States District Judge:

     Eric Weinberg ("Weinberg"), Robert Sudakow ("Mr. Sudakow"), and Joanne Sudakow ("Mrs. Sudakow" and together, "Plaintiffs") commenced this putative class action against CleanChoice Energy, Inc. ("CleanChoice" or "Defendant") on November 2, 2023. (Doc. 1, "Compl."). Before the Court are Defendant's motions to: (i) compel arbitration pursuant to the Federal Arbitration Act, and (ii) dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6). Defendant filed its motion to compel arbitration on January 18, 2024. (Doc. 18, "Def. Br."; Doc. 18-1, "Paul Decl."). Plaintiffs filed their opposition on February 15, 2024. (Doc. 27, "Pl. Br."; Doc. 28, "Sudakow Decl."; Doc. 29, "McInturff Decl."). Defendant filed its reply on February 29, 2024. (Doc. 31, "Reply"; Doc. 31-1, "Paul Suppl. Decl."; Doc. 31-15, "Wizig Decl."). Plaintiffs sought and obtained the Court's leave to file sur-reply (Doc. 35) and the motion was fully submitted with the filing of Plaintiffs' sur-reply on April 12, 2024 (Doc. 38, "Sur-Reply"). Defendant filed its motion to dismiss, pursuant to the briefing schedule set by the Court, on May 15, 2024. (Doc. 39, "MTD Def. Br."). Plaintiffs filed their opposition to Defendant's motion to dismiss (Doc. 40, "MTD Pl. Br.") and the motion was fully submitted with the filing of Defendant's reply (Doc. 41, "MTD Reply").

For the reasons set forth below, Defendant's motion to compel arbitration is GRANTED with respect to Plaintiff Eric Weinberg and DENIED with respect to Plaintiffs Robert Sudakow and Joanne Sudakow, and the motion to dismiss is GRANTED IN PART and DENIED IN PART.

## **BACKGROUND**

I.   Plaintiff Eric Weinberg

CleanChoice is an independent energy service company ("ESCO") that sells electricity in deregulated energy markets across the United States. (Compl. ¶ 2). Mr. Weinberg enrolled by telephone on April 4, 2017 for one year of fixed-rate electricity supply from CleanChoice. (Paul Suppl. Decl. ¶ 17). A CleanChoice representative, during the initial enrollment call, told Mr. Weinberg that CleanChoice "will initiate two mailers. One will be a terms and conditions form from us, and the other one will be from ConEd." (Wizig Decl., Ex. C-1 at 23:5-7). Mr. Weinberg responded "okay." (*Id.* at 23:8). CleanChoice uses a vendor, Automatic Mailing Inc. ("AMi"), which prints customer agreements and mails them on behalf of CleanChoice via the U.S. Mail. (Paul Suppl. Decl. ¶ 5). CleanChoice provides to AMi a data file containing information pertaining to customers who enrolled on the previous business day, which includes the customers' contact information and the product code on which they enrolled, among other identifying information. (*Id.* ¶ 5, Ex. B-1). This data file is referred to as "Customer Parameters." (*Id.*). CleanChoice sent AMi Mr. Weinberg's Customer Parameters on April 5, 2017. (*Id.* ¶ 8, Ex. B-2). AMi sent a customer agreement to Mr. Weinberg containing an arbitration provision, which stated that the parties "agree irrevocably and unconditionally to settle any actions, complaints or disputes related to this contract or the transactions contemplated by this contract under the rules of the American Arbitration Association." (*Id.*, Ex. B-2 at 3).

Mr. Weinberg re-enrolled in fixed-rate contracts in April 2018 and again in April 2019. (*Id.* ¶¶ 10-13, 18-19). CleanChoice sent Mr. Weinberg customer agreements via AMi both times he re-enrolled as they did with the initial enrollment. (*Id.*). Every one of the three customer agreements sent to Mr. Weinberg included an identical arbitration provision. (*Id.*). The customer agreements also stated that the parties' agreement would renew automatically on a variable month-to-month basis after a year unless Mr. Weinberg cancelled or re-enrolled. (*Id.*). Mr. Weinberg's agreement automatically renewed into monthly variable rates beginning in April 2020 because he chose not to cancel or enroll in a fourth fixed rate. (Paul Decl. ¶ 8). Mr. Weinberg terminated his service in May 2023, approximately six years after enrolling with CleanChoice. (*Id.* ¶ 9).

II.     <u>Plaintiffs Robert and Joanne Sudakow</u>

Mrs. Sudakow received an enrollment form from CleanChoice that offered renewable electricity at a variable rate. (Compl., Ex. A; Paul Decl. ¶ 10). The enrollment form contained the terms and conditions of the proposed agreement, an FAQ sheet, and a signature page. (Compl., Ex. A.). Mr. Sudakow signed the enrollment form on his wife's behalf on October 29, 2021, authorizing CleanChoice's enrollment of her account, and mailed the enrollment form back to CleanChoice. (*Id.*; Sudakow Decl. ¶ 3). The terms and conditions of the enrollment form sent by CleanChoice provide that it constitutes "the entire Agreement between Customer and CleanChoice with regard to Customer's purchase of electric commodity or other related services from CleanChoice." (Compl., Ex. A at 1). The terms and conditions of the enrollment form further provide that "[t]his Agreement will be governed by the laws of NY without regard to the application of its conflicts of law principles. Venue for any lawsuit brought to enforce any term or condition of this Agreement will lie exclusively in NY." (*Id.*).

CleanChoice sent Customer Parameters for Mrs. Sudakow to AMi on November 17, 2021. (Paul Suppl. Decl. ¶ 14, Ex. B-7). AMi thereafter mailed a customer agreement to Mrs. Sudakow via the U.S. Mail. (*Id.* ¶ 15). The customer agreement provided that the parties agreed "irrevocably and unconditionally to settle any actions, complaints or disputes related to this contract or the transactions completed by this contract under the rules of the American Arbitration Association." (*Id.*, Ex. B-8 at 5). The customer agreement further provided that Mrs. Sudakow would be receiving monthly invoices and that she could "rescind this Agreement without penalty within three (3) business days after receiving Your confirmation letter from Niagara Mohawk, a National Grid Co., by calling CleanChoice Energy at 1-855-715-7311, Monday to Friday, 8 am to 8 pm eastern and Saturday, 9 am to 5 pm eastern, or emailing support@cleanchoiceenergy.com." (*Id.* at 2). Mrs. Sudakow terminated her service in August 2022, approximately nine months after enrolling with CleanChoice. (Paul Decl. ¶ 12).

## STANDARD OF REVIEW

### I.     Motion to Compel Arbitration

"An arbitration clause is enforceable if (a) the parties have entered into a valid agreement to arbitrate, and (b) the dispute at issue comes within the scope of the arbitration agreement. State contract law governs this analysis." *Behrens v. JPMorgan Chase Bank, N.A.*, No. 21-2603, 2024 WL 1090856, at *3 (2d Cir. Mar. 13, 2024) (citing *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011)). "In deciding motions to compel [arbitration], courts apply a 'standard similar to that applicable to a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003)). Thus, when ruling on a motion to compel arbitration, a court should "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions,

answers to interrogatories, and admissions on file, together with affidavits." *Id.* If there is no "genuine issue of material fact" as to the arbitrability of the dispute, the Court may decide the motion without a trial. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012).

"When moving to compel arbitration, '[t]he party seeking . . . arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made.'" *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (quoting *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010)). "Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to 'show the agreement to be inapplicable or invalid.'" *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 102 (2d Cir. 2022) (quoting *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010)). Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The FAA embodies a national policy favoring arbitration founded upon a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, their disputes." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019). "Arbitration is 'a matter of contract between the parties; it is a way to resolve those disputes–but only those disputes–that the parties have agreed to submit to arbitration.'" *DDK Hotels, LLC v. Williams-Sonoma*, Inc., 6 F.4th 308, 316 (2d Cir. 2021) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)).

Where there are "threshold questions of arbitrability, such as whether the arbitration agreement applies to a particular dispute," the Second Circuit has instructed that these issues "presumptively should be resolved by the court and not referred to the arbitrator." *DDK Hotels*, 6 F.4th at 317 (citing *Doctor's Assocs.*, 934 F.3d at 250-51). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that

5

they did so." *Id.* (quoting *First Options*, 514 U.S. at 943). "The concept of arbitrability 'include[s] questions such as whether the parties are bound by a given arbitration clause, or whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 153 (2d Cir. 2021) (quoting *BG Grp. PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014)). "[I]n the absence of an arbitration agreement that clearly and unmistakably elects to have the resolution of the arbitrability of the dispute decided by the arbitrator, the question whether the particular dispute is subject to an arbitration agreement 'is typically an issue for judicial determination.'" *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)).

II.    Motion to Dismiss

A.    Federal Rule of Civil Procedure 12(b)(1)

"Federal courts are courts of limited jurisdiction, and Rule 12(b)(1) requires dismissal of an action 'when the district court lacks the statutory or constitutional power to adjudicate it.'" *Schwartz v. Hitrons Sols., Inc.*, 397 F. Supp. 3d 357, 364 (S.D.N.Y. 2019) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "The party invoking the Court's jurisdiction bears the burden of establishing jurisdiction exists." *Hettler v. Entergy Enters., Inc.*, 15 F. Supp. 3d 447, 450 (S.D.N.Y. 2014) (citing *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009)). When deciding a motion to dismiss under Rule 12(b)(1) at the pleadings stage, "the Court 'must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor.'" *Id.* (quoting *Conyers*, 558 F.3d at 143); *see also Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 274 (S.D.N.Y. 2019). "Where, as here, the defendant moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge

first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Saint-Amour v. Richmond Org., Inc.*, 388 F. Supp. 3d 277, 286 (S.D.N.Y. 2019) (quoting *United States v. New York City Dep't of Hous., Pres. & Dev.*, No. 09-CV-06547, 2012 WL 4017338, at *3 (S.D.N.Y. Sept. 10, 2012)).

B. Federal Rule of Civil Procedure 12(b)(3)

"The legal standard for a motion to dismiss for improper venue [pursuant to Rule 12(b)(3) is the same as a motion to dismiss for lack of personal jurisdiction." *Casville Invs., Ltd.* v. *Kates*, No. 12-CV-06968, 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)). The plaintiff bears the burden, but need only make a *prima facie* showing, that venue is proper. *Id.* The court is obligated to credit the plaintiff's factual averments as true, construe the pleadings in the light most favorable to the plaintiff, and resolve all doubts in plaintiff's favor. *Id.* (citing, in order, *Robertson-Ceco Corp.*, 84 F.3d at 567; *Boehner v. Heise*, 410 F. Supp. 2d 228, 240 (S.D.N.Y. 2006); *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008); and *Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 513 (S.D.N.Y. 2012), *aff'd*, 740 F.3d 211 (2d Cir. 2014)).

Whether venue is "improper" for the purposes of Rule 12(b)(3) is governed by 28 U.S.C. § 1391. *Wynn*, 509 F. Supp. 3d at 49. Section 1391 specifies that venue is proper in a particular district if (i) at least one defendant resides in the district and all the defendants reside in the same state in which the district is located; (ii) a "substantial part of the events or omissions giving rise to the claim occurred" in the district; or (iii) a defendant is subject to personal jurisdiction in the district and "there is no district in which an action may otherwise be brought." 28 U.S.C. § 1391.

C. Federal Rule of Civil Procedure 12(b)(6)

On a Rule 12(b)(6) motion, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the ple[d] factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id*. The factual allegations pled "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"When there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Thus, the court must "take all well-ple[d] factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff[ ]." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996). The presumption of truth, however, "'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678 (alteration in original)). Therefore, a plaintiff must provide "more than labels and conclusions" to show entitlement to relief. *Twombly*, 550 U.S. at 555.

## ANALYSIS

### I.    Motion to Compel Arbitration

"The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman*, 49 F.4th at 101–02. Plaintiffs argue that Defendant

has failed to meet its burden of demonstrating that an agreement to arbitrate was made with respect to Mr. Weinberg or Mrs. Sudakow. The Court will analyze Mr. Weinberg and the Sudakows separately.

    A. <u>Plaintiff Eric Weinberg</u>

The Court first considers, with respect to Mr. Weinberg, whether "the parties have entered into a valid agreement to arbitrate." *Behrens*, 2024 WL 1090856, at *3. Plaintiffs argue, relying on the Second Circuit's decision in *Schnabel*, 697 F.3d 110, 114 (2d Cir. 2012), that Defendant has not established that Mr. Weinberg assented to the customer agreement that was sent to Mr. Weinberg following the initial enrollment call. (Sur-Reply at 5-9). The plaintiffs in *Schnabel* enrolled in a membership program offering discounts on certain products for a monthly fee. 697 F.3d at 110. The plaintiffs were sent an email with the terms and conditions of the program, containing an arbitration provision, following the initial enrollment. *Id.* The Second Circuit held that "[w]e do not think that an unsolicited email from an online consumer business puts recipients on inquiry notice of the terms enclosed in that email and those terms' relationship to a service in which the recipients had already enrolled, and that a failure to act affirmatively to cancel the membership will, alone, constitute assent." *Id.* at 123.

The instant facts, with respect to Mr. Weinberg, are distinguishable from *Schnabel.* Mr. Weinberg initiated a telephone call with a CleanChoice representative to commence his enrollment and was informed by that representative that CleanChoice would be mailing him terms and conditions that would govern the service after the enrollment call. (Paul Suppl. Decl. ¶ 17; Wizig Decl., Ex. C-1 at 23:5-8). Mr. Weinberg acknowledged that he understood that the terms and conditions would be mailed to him by responding "okay" to the CleanChoice representative. (Wizig Decl., Ex. C-1 at 23:5-8). Defendant submitted an audio recording of Plaintiff's initial

enrollment call with CleanChoice as well as a transcript of that call. (*Id.*, Ex. C-1). Defendant has also submitted two declarations from a custodian of its records and its Vice President for Product and Tech Strategy, Antonina Paul, which state that CleanChoice's vendor mailed Mr. Weinberg the customer agreement after the initial enrollment call. (*See* Paul Decl.; Paul Suppl. Decl.). The declarations detail the process by which CleanChoice asks customers for their mailing address and other pertinent contact information and then forwards that information to its vendor so it can generate and print the customer agreement and mail it via the U.S. Mail. (*Id.*). Defendant need not, as Plaintiffs argue, establish that Mr. Weinberg actually received the customer agreement containing the terms and conditions. (Sur-Reply at 7). "New York law has established a presumption that a party has received documents when mailed to the party's address in accordance with regular office procedures." *Manigault v. Macy's E., LLC*, 318 F. App'x 6, 7 (2d Cir. 2009). Plaintiffs have not submitted a declaration from Mr. Weinberg, or any other evidence to rebut the presumption that he received the customer agreement that was mailed to him in accordance with CleanChoice's regular office procedures.

Mr. Weinberg's conduct following his initial enrollment further bolsters Defendant's argument that he assented to the terms and conditions contained in the customer agreement. Mr. Weinberg continued to use CleanChoice for six years after enrollment and re-enrolled twice during that period. (Paul Suppl. Decl. ¶¶ 10-13, 18-19). Both re-enrollments involved telephone calls with a CleanChoice representative after which CleanChoice mailed Mr. Weinberg terms and conditions containing identical arbitration provisions. (*Id.*). Mr. Weinberg received and paid invoices during these six years for the services provided by CleanChoice. (Reply at 5). The terms of the customer agreement provided Mr. Weinberg with an opportunity to opt out, stating that he could "rescind this Agreement without penalty at any time within three (3) business days after receiving the

confirmation letter from Consolidated Edison Co. of New York by calling CleanChoice Energy" and further provided that he could "cancel this contract without a termination fee by providing thirty (30) days advance notice to CleanChoice Energy via telephone or email." (Paul Suppl. Decl., Ex. B-2 at 2). The terms and conditions further stated that the customer agreement was not deemed effective until "*after* the recission period has ended." (*Id.* (emphasis added)).

The instant facts are closer to *Edwards v. Macy's Inc.*, where the defendants "sent [p]laintiff a mailing" containing the terms and conditions governing the department store credit card account at issue in that case and the arbitration agreement there was "specifically designated in its own section of the agreement and set off from the rest of the terms and conditions." No. 14-CV-08616, 2015 WL 4104718 (S.D.N.Y. June 30, 2015) (applying South Dakota law). The plaintiff in that case, just as here, had a period of time to review the agreement before she was charged for the program and "received the mailed copy of the terms and conditions before undertaking any financial obligation whatsoever, and she could have ended her enrollment before incurring any charges by the simple expedient of reading her mail." *Id.* Judge McMahon found that defendant had established that the plaintiff assented to a valid offer to participate in the program and granted the motion to compel arbitration. *Id.* Judge Forrest, in *Valle v. ATM Nat., LLC*, distinguished the facts in *Schnabel* where, "[r]ather than burying the arbitration provision in an unexpected email, here [defendant] mailed the Amended Agreement to the address regularly used to communicate with its customers." No. 14-CV-07993, 2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) (applying New York law). Judge Forrest further found that the defendant "gave plaintiffs sufficient opportunity to reject the Amended Agreement and the Arbitration Provision, but they chose not to do so." *Id.* Similarly, in *Weiss v. Am. Express Nat'l Bank*, Judge Oetken found that a valid agreement to arbitrate existed where the plaintiff received terms governing a credit card

program by mail after enrollment and used the credit following receipt of those terms. No. 19-CV-04720, 2020 WL 6807628 (S.D.N.Y. Nov. 18, 2020) (applying New York law).

Defendant has put forward unrebutted evidence that Mr. Weinberg was informed on the initial enrollment telephone call that he would be mailed the terms and conditions following his enrollment. The terms and conditions themselves give Mr. Weinberg the opportunity to rescind the contract before the agreement became effective and has a separate, clearly delineated section containing the arbitration provision at issue. Mr. Weinberg continued to use CleanChoice for six years following his initial enrollment, a period which included two separate re-enrollments where he was mailed customer agreements containing an identical arbitration provision. The Court finds that Defendant has met its burden of proof in establishing that Mr. Weinberg assented to the arbitration agreement in the customer agreement mailed to him following the enrollment call.

The Court turns next to whether "the dispute at issue comes within the scope of the arbitration agreement." *Behrens*, 2024 WL 1090856, at *3. The customer agreement's arbitration provision states that the parties "agree irrevocably and unconditionally to settle any actions, complaints, or disputes related to this contract or the transactions contemplated by this contract under the rules of the American Arbitration Association." (Paul Suppl. Decl., Ex. B-2 at 5). "Incorporation of the AAA's rules can serve as clear and unmistakable evidence of the parties' intent to delegate questions of arbitrability to an arbitrator when it is coupled with an arbitration provision that is broad and expresses the intent to arbitrate all aspects of all disputes." *Staley v. Hotel 57 Servs., LLC*, No. 23-770, 2024 WL 1090816, at *3 (2d Cir. Mar. 13, 2024) (citing *DDK Hotels*, 6 F.4th at 318-19). That is precisely the case here. The arbitration provision incorporates the AAA's rules and is coupled with language that is broad and expresses an intent to arbitrate all aspects of all disputes concerning the customer agreement or any transactions contemplated by the

customer agreement. All contract and statutory disputes herein are therefore clearly and unmistakably delegated for the arbitrator to resolve.

Accordingly, the Court GRANTS the motion to compel arbitration with respect to Plaintiff Eric Weinberg.

B.  Plaintiffs Robert and Joanne Sudakow

The Court first considers, with respect to Mr. and Mrs. Sudakow, whether "the parties have entered into a valid agreement to arbitrate." *Behrens*, 2024 WL 1090856, at *3. CleanChoice first mailed Mrs. Sudakow an enrollment form, which Mr. Sudakow signed on her behalf and mailed back. (Sudakow Decl. ¶ 3). The enrollment form stated that "[t]his Agreement will be governed by the laws of NY without regard to the application of its conflicts of law principles. Venue for ***any lawsuit*** brought to enforce any term or condition of this Agreement will lie exclusively in NY." (Compl., Ex. A (emphasis added)). CleanChoice then directed its vendor to mail Mrs. Sudakow a customer agreement which contained an arbitration provision. (Paul Suppl. Decl., Ex. B-8). Plaintiffs argue that the later-sent customer agreement did not amend the signed enrollment form because such an amendment is barred by N.Y. Gen. Bus. Law § 349-d. (Pl. Br. at 15). Plaintiffs alternatively argue that even if N.Y. Gen. Bus. Law § 349-d does not apply, terms and conditions of the customer agreement do not amend or supersede the enrollment form because the Sudakows did not have notice of the later-sent terms and did not assent to them. (*Id.* at 15-20).

Section 349-d(6) provides that "[n]o material change shall be made in the terms of duration of any contract for the provision of energy services by an ESCO without the express consent of the customer." N.Y. Gen. Bus. Law § 349-d(6). The statute specifies that "[a] change in price or a change to or from fixed or variable pricing shall be deemed to be material." *Id.* The Second Circuit held in *Aceros Prefabricados, S.A. v. TradeArbed, Inc.* that "arbitration agreements do not, as a

matter of law, constitute material alterations to a contract." 282 F.3d 92, 101 (2d Cir. 2002) (applying New York law). Section 349-d(6) states that changes in price or a change to or from fixed or variable pricing are examples of material changes in the context of an ESCO agreement. N.Y. Gen. Bus. Law § 349-d(6). New York's Uniform Commercial Code § 2-207 defines a material alteration as one that would "result in surprise or hardship if incorporated without express awareness by the other party." N.Y. U.C.C. § 2-207 cmt. 4. Plaintiffs do not argue that the addition of the arbitration provision resulted in surprise or hardship to the Sudakows. Section 349-d(6) of the General Business Law accordingly is not applicable.

Plaintiffs alternatively argue that even if Section 349-d does not apply, the customer agreement is nevertheless ineffective under *Schnabel* because Mrs. Sudakow did not have sufficient notice of its terms and conditions or an opportunity to assent. (Pl. Br. at 15-20). Defendant, through their vendor, mailed Mrs. Sudakow the customer agreement shortly after they received her signed enrollment form. (Paul Suppl. Decl. ¶ 15). However the Sudakows, unlike Mr. Weinberg, were never notified by Defendant that they would be mailed additional or superseding terms and conditions. The plaintiffs in *Schnabel* were similarly presented with an arbitration provision after they had completed an enrollment form, albeit in that case the arbitration provision was delivered via email. 697 F.3d at 126. The Second Circuit, applying Connecticut and California law, found that "there was no prior relationship between the parties that would have suggested that terms sent by email after the initial enrollment were to become part of the contract" and accordingly held that "plaintiffs were never put on inquiry notice of the arbitration provision." *Id.* at 126-27. Applying New York law does not change this conclusion. In *Valle*, Judge Forrest—applying New York law—held that plaintiffs were on notice of an amendment to their credit card agreement adding an arbitration provision where the credit card company sent plaintiffs "an

explanatory one-page cover letter" which "highlighted that the Amended Agreement would supersede any previous agreement and specifically pointed out the new Arbitration Provision." 2015 WL 413449, at *3. The cover letter sent by the defendant in *Valle* further provided that "customers could reject the Arbitration Provision by sending a signed arbitration rejection notice to [defendant] within 45 days." *Id.* Defendant did not notify the Sudakows that the customer agreement would amend or supersede the terms of the enrollment form, and did not specifically call attention to the presence of the arbitration provision in the customer agreement. The enrollment form here, unlike the initial agreement in *Edwards*, does not contain any language which gives Defendant the unilateral right to modify the terms and conditions for any reason.[1] 2015 WL 4104718, at *6 ("The initial Credit Card Agreement states: 'We may change any terms of this agreement . . . unless prohibited by law. When required by law we will mail you prior notice of changes.' That constitutes notice that the agreement may be modified.").

Defendant next argues that the Sudakows assented to the terms of the customer agreement because they "received and paid for continuous electricity service from CleanChoice for about a year." (Def. Br. at 9). The Second Circuit squarely rejected this argument in *Schnabel*, where it held that continued payments "were too passive for any reasonable fact-finder to conclude that they manifested a subjective understanding of the existence of the arbitration and other emailed provisions and an intent to be bound by them." 697 F.3d at 128. The same is true here. The arbitration provision in the customer agreement "was both temporally and spatially decoupled

---

[1] The enrollment form signed by the Sudakows instead states that "[i]f at some future date there is a change in any law, rule, regulation, tariff, or regulatory structure ('Regulatory Change') which impacts any term, condition or provision of this Agreement including, but not limited to price, CleanChoice shall have the right to modify this Agreement to reflect such Regulatory Change by providing 30 days' written notice of such modification to Customer." (Compl., Ex. A at 1). Defendant does not argue that the customer agreement sent to the Sudakows here was the result of such a "Regulatory Change."

from [the Sudakows'] enrollment" and as such, the Sudakows did not expressly or impliedly assent to the new arbitration provision of the customer agreement. *Id.* at 127.

Accordingly, the Court DENIES the motion to compel arbitration with respect to Plaintiffs Robert Sudakow and Joanne Sudakow.

II.    <u>Motion to Dismiss</u>

Defendant moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6). Defendant argues (1) that Mr. Sudakow lacks Article III standing; (2) that all Plaintiffs lack standing to pursue injunctive relief; (3) that the proper venue for the Sudakows' claims is in the Northern District of New York; and (4) that Plaintiffs have failed to state claims for relief. The Court addresses each of these arguments in turn.

A.    <u>Federal Rule of Civil Procedure 12(b)(1)</u>

1.    <u>Mr. Sudakow's Article III Standing</u>

Defendant argues that Mr. Sudakow lacks Article III standing because his "sole relation to this case is the fact that he is married to Mrs. Sudakow." (MTD Def. Br. at 4). Plaintiffs argue that Mr. Sudakow has standing because "[h]e was exposed to CleanChoice's deceptive marketing, decided jointly with his wife to sign up, and then signed his wife's name to CleanChoice's contract." (MTD Pl. Br. at 3). Plaintiffs do not allege or otherwise argue that Mr. Sudakow is a third-party beneficiary to the contract between CleanChoice and Mrs. Sudakow. The only allegation regarding Mr. Sudakow's involvement is that his wife received marketing materials and an enrollment form from CleanChoice and that Mrs. Sudakow "permitted Mr. Sudakow to sign the authorization form in her name, which he did." (Compl. ¶ 53). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Here, Mr.

Sudakow brings claims for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) violation of N.Y. Gen. Bus. Law § 349, (4) violation of N.Y. Gen. Bus. Law § 349-d(3), (5) violation of N.Y. Gen. Bus. Law § 349-d(7), (6) violation of state consumer protection statutes, and (7) unjust enrichment. Plaintiffs' opposition only addresses Mr. Sudakow's standing with respect to the false advertising claims, the third, fourth, fifth, and sixth claims for relief, but fails to address the remaining claims. (MTD Pl. Br. at 3-4). Accordingly, the Court dismisses, as unopposed, the first, second, and seventh claims for relief against Plaintiff Robert Sudakow for lack of standing. *See Farag v. XYZ Two Way Radio Serv., Inc.*, No. 22-1795, 2023 WL 2770219, at *2 (2d Cir. Apr. 4, 2023) ("In a counseled case, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

Plaintiffs have failed to establish that Mr. Sudakow has standing with respect to any of the remaining claims in this action. Plaintiffs' allegation that Mr. Sudakow signed Mrs. Sudakow's name on the enrollment form, without more, is insufficient to establish standing for any of the claims that he asserts in this action. *See Bell v. Gateway Energy Servs. Corp.*, No. 17-CV-03893, 2017 WL 5956887, at *1 (S.D.N.Y. Nov. 29, 2017) ("Walker's sole connection to the case is his marriage to Erin Hitchner—he has not himself contracted with either defendant. Accordingly, there can be no doubt that he has no standing to participate in this action."). This case is distinguishable from *Donin v. Just Energy Grp., Inc.*, where the court held that a non-signatory spouse had standing to pursue breach of contract claims against an ESCO under a third-party beneficiary theory because the spouse "was the recipient of the welcome emails which were sent to her by the Just Energy customer service representative who pitched to her in person." No. 17-CV-05787, Doc. 111 (E.D.N.Y. Sept. 24, 2021). Here, Plaintiffs do not allege that Mr. Sudakow

had any interactions with CleanChoice prior to Mrs. Sudakow's enrollment, and the "marketing material and authorization form were addressed to Plaintiff Joanne Sudakow." (Compl. ¶ 53). The terms of the enrollment agreement, unlike the agreement in *Donin*, specifically stated "[t]here are no third party beneficiaries to this Agreement" nor do Plaintiffs argue that Mr. Sudakow is a third-party beneficiary of the agreement. (Compl., Ex. A).

Accordingly, Defendant's motion to dismiss Plaintiff Robert Sudakow for lack of standing is GRANTED.

### 2. Plaintiffs' Standing to Seek Injunctive Relief

Defendant argues that Plaintiffs "lack standing to seek injunctive relief." (MTD Def. Br. at 6). Plaintiffs state in their opposition that in order "[t]o streamline the issues before this Court, Plaintiffs will re-file their injunctive claim in state court." (MTD Pl. Br. at 4, n.4). Accordingly, Defendant's motion to dismiss the request for injunctive relief is GRANTED on consent.

### B. Federal Rule of Civil Procedure 12(b)(3)

Defendant argues that venue is improper in the Southern District of New York because "the Sudakows' claims do not arise out of CleanChoice's contract with Mr. Weinberg, but rather out of conduct that occurred in the Northern District of New York." (MTD Def. Br. at 7). A civil action may be brought "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). Pursuant to 28 U.S.C. § 1391(d), "in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State." Plaintiff has established that the Court can exercise personal jurisdiction over CleanChoice, as it is doing

business in the Southern District for New York, arising from its contract with Mr. Weinberg. CleanChoice therefore resides in the Southern District of New York for the purposes of determining venue pursuant to 28 U.S.C. § 1391(d) and venue is accordingly proper in this District.

Accordingly, Defendant's motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3) is DENIED.

C. Federal Rule of Civil Procedure 12(b)(6)

1. Contract-Based (First, Second, and Seventh) Claims for Relief

The contract between Mrs. Sudakow and CleanChoice contains a variable rate pricing term that represents that provides,

> "Your bill will be calculated using a variable rate per kilowatt hour multiplied by kilowatt hours used. You must also pay all applicable federal, state, and local taxes and charges. Your price may vary each month and is based on a number of costs which may include, but are not limited to: energy, transmission, capacity, ancillary services, renewable energy certificates, RTO system fees and other factors, plus CleanChoice Energy operating costs, expenses, and margins. This list of factors is not exhaustive and no single factor will determine the rate. Additionally, we seek to acquire a majority of our anticipated electricity supply in advance rather than from the spot market. For all of these reasons, your variable rate may not correlate with changes in wholesale market prices or your utility's rates. Your variable rate may be higher than your utility rate or other suppliers' rates."

(Compl., Ex. A at 1). The Complaint alleges that Defendant breached the variable pricing term because "Defendant charged variable rates for electricity that were untethered from the factors upon which the parties agreed the rate would be based." (Compl. ¶ 139). Defendant argues, relying on *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401 (2d Cir. 2023), that the variable rate pricing term "does not promise rates based only on costs." (MTD Def. Br. at 10-11). The variable rate pricing term in *Agway* provided that the variable rate would "be determined at Agway's discretion" and that the rate would "reflect the cost of electricity acquired by Agway from all

sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins." 88 F.4th at 407-08. The Second Circuit found that the term "gave Agway 'discretion' to consider" certain "unspecified market-related factors" when setting the variable rate. *Id.* at 412-13 ("In sum, the plain language of the Agreement permitted Agway to consider factors beyond its procurement costs when setting its monthly variable rates. Accordingly, no genuine dispute of material fact remains as to whether Agway breached its obligations to Gonzales when it set its rates based on factors like its costs, expenses, and margins.").

The Second Circuit reached the same result in *Richards v. Direct Energy Servs., LLC*, where the variable pricing term provided that "[a]fter the Initial Term and during the Renewal Period, the rate for electricity will be variable each month at Direct Energy's discretion. The rate may be higher or lower each month based upon business and market conditions." 915 F.3d 88, 97 (2d Cir. 2019). The Second Circuit held that this contractual language "in no way states or implies" that it was improper for the ESCO to set the variable rate based upon factors unrelated to its costs, "nor does it suggest that the variable rate bears a direct relationship to Direct Energy's procurement costs." *Id.* The Second Circuit interpreted another ESCO variable rate pricing term in *Mirkin v. XOOM Energy, LLC*, which provided that, "[y]our rate for energy purchases will be a variable rate, per kWh, that may change on a monthly basis, plus taxes and fees, if applicable. Your monthly variable rate is based on XOOM's actual and estimated supply costs which may include but not be limited to prior period adjustments, inventory and balancing costs." 931 F.3d 173, 175 (2d Cir. 2019). The Second Circuit found that the plaintiff plausibly stated a claim for breach of contract where plaintiff alleged that the ESCO "did not base its rates on its supply costs." *Id.*

The variable rate pricing term here is closer to the term in *Mirkin* than the terms in *Richards* or *Agway*. The variable rate pricing terms in both *Richards* and *Agway* provided that the rate would be set at the ESCO's discretion. *See Richards*, 915 F.3d at 97 ("the rate for electricity will be variable each month at Direct Energy's discretion"); *Agway*, 88 F.4th 401 (setting an introductory rate of $0.44 per Kwh for electricity and "thereafter a monthly variable rate, to be determined at Agway's discretion"). No such language is present in the instant term. Rather the pricing term here states that the price "may vary each month and is ***based on a number of costs***" and then provides an illustrative list of those costs. (Compl., Ex. A (emphasis added)). This language is closer to the pricing term in *Mirkin*, which provided that the rate "is based on XOOM's actual and estimated supply costs." 931 F.3d at 175. The Complaint alleges that Defendant breached this term by basing the variable rate on factors that were not related to cost. (Compl. ¶ 139). Here, just as in *Mirkin*, Plaintiff has "plausibly stated a claim for breach of contract." *Id.* at 178.

Defendant also seeks to dismiss the claims for breach of the implied covenant of good faith and fair dealing and for unjust enrichment. (MTD Def. Br. at 17, 24). The Court need not dismiss the claim for breach of the implied covenant of good faith and fair dealing at the pleading stage because "it is conceivable that a factfinder might conclude that the contract itself did not promise what Plaintiff[s] expected but that, nevertheless, Defendant violated a 'duty of good faith' that it owed to less-informed consumers in providing something as universally necessary as utility services." *Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415 (S.D.N.Y. 2020). The unjust enrichment claim however fails as a matter of law. "A plaintiff may plead unjust enrichment in the alternative" as Plaintiff does here, but only if "there is a dispute over the existence, scope, or enforceability of the putative contract." *Hofmann v. Long Island Univ.*, No. 22-393, 2024 WL 3262819, at *1 (2d Cir. July 2, 2024). There is no dispute here that a contract existed between Mrs.

Sudakow and CleanChoice. "Accordingly, [Plaintiff's] unjust enrichment claim is entirely duplicative of [their] breach of contract claim" and is dismissed. *Id.*

Accordingly, the Court GRANTS Defendant's motion to dismiss for failure to state a claim with respect to the remaining Plaintiff's unjust enrichment claim and DENIES the motion with respect to that Plaintiff's claim for breach of contract and breach of the implied covenant of good faith and fair dealing.

### 2.   False Advertising (Third, Fourth, Fifth, and Sixth) Claims for Relief

Mrs. Sudakow's ("Plaintiff") remaining four claims for relief allege that Defendant engaged in deceptive trade practices in violation of N.Y. Gen. Bus. Law §§ 349, 349-d(3), and 349-d(7) and various other consumer protection statutes. (Compl. ¶¶ 150-210). The Complaint identifies six allegedly deceptive practices regarding CleanChoice's variable rates (Compl. ¶ 154) and four allegedly misleading statements regarding the source of the electricity CleanChoice supplies (*id.* ¶¶ 154, 175, 194). Defendant argues that Plaintiff has failed to plausibly allege that the statements at issue were materially misleading. (MTD Def. Br at 18-23). Plaintiff has identified the specific practices and representations that they allege to be false or misleading, and they plausibly allege that they were damaged by those practices or representations by being overcharged for electricity by CleanChoice. These allegations are sufficient to plausibly allege injury as a result of Defendant's false advertising and deceptive trade practices. *See Blockchain Luxembourg S.A. v. Paymium, SAS*, No. 18-CV-08612, 2019 WL 4199902, at *11 (S.D.N.Y. Aug. 7, 2019) (denying a motion to dismiss false advertising claims brought under N.Y. Gen. Bus. Law § 349).

Defendant next argues that the N.Y. Gen. Bus. Law "provides a 'complete defense' where an act or practice is 'subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission." (MTD Def. Br. at 21 (citing N.Y. Gen. Bus. L. §

349(d)). Defendant argues that its compliance "with the FTC's Green Guides is a separate and independent basis for dismissal of the renewable energy claims." (*Id.* (citing 16 C.F.R. § 260.15(a)). Whether Defendant's practices and representations comply with the requirements of the FTC's Green Guides is a fact-intensive inquiry that is not appropriate for adjudication on the pleadings. *See Mason v. Reed's Inc.*, 515 F. Supp. 3d 135, 145 (S.D.N.Y. 2021) (holding that it was premature to conclude at the motion to dismiss phase "that the defendant complied with the relevant safe harbor provisions" of N.Y. Gen. Bus. Law § 349).

Accordingly, the Court DENIES the motion to dismiss for failure to state a claim with respect to the third, fourth, fifth, and sixth claims for relief.

D. Plaintiff's Class Allegations

Defendant argues that Plaintiff's class allegations should be dismissed as implausibly pled because "Plaintiffs have no basis to allege that all CleanChoice materials are substantially similar to those they attach." (MTD Def. Br. at 25). Motions seeking to limit class allegations at the pleadings stage are "disfavored" because they ask "a reviewing court to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery . . . on questions relevant to class certification." *Herrick v. Shutterstock, Inc.*, No. 23-CV-03191, 2024 WL 1348754, at *4 (S.D.N.Y. Mar. 29, 2024). "[W]here, as here, the defendant's arguments are indistinguishable from the issues that would be decided in the context of a motion for class certification, the motion is generally considered procedurally premature." *Id.*

Accordingly, Defendant's motion to dismiss Plaintiff's class allegations is DENIED.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion to compel arbitration with respect to Plaintiff Eric Weinberg and DENIES the motion to compel arbitration with respect to Plaintiffs Robert Sudakow and Joanne Sudakow. Mr. Weinberg's claims are STAYED pending the conclusion of the arbitration proceedings.

The Court GRANTS Defendant's motion to dismiss Plaintiff Robert Sudakow for lack of standing under Federal Rule of Civil Procedure 12(b)(1). The Court GRANTS Defendant's motion to dismiss the request for injunctive relief under Federal Rule of Civil Procedure 12(b)(1) on consent. The Court DENIES Defendant's motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3). The Court GRANTS Defendant's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) with respect to the seventh (unjust enrichment) claim against Plaintiff Joanne Sudakow and DENIES the motion with respect to Plaintiff Joanne Sudakow's first (breach of contract), second (breach of the implied covenant of good faith and fair dealing), third (violation of N.Y. Gen. Bus. Law § 349), fourth (violation of N.Y. Gen. Bus. Law § 349-d(3)), fifth (violation of N.Y. Gen. Bus. Law § 349-d(7)), and sixth (violation of state consumer protection statutes) claims for relief.

The following claims shall proceed to discovery with respect to Plaintiff Joanne Sudakow: the first, second, third, fourth, fifth, and sixth claims for relief. Defendant shall file its Answer to the Complaint within ten (10) days of the issuance of this Opinion & Order.

The Clerk of Court is respectfully directed to terminate Plaintiff Robert Sudakow as a party to this action and terminate the motions pending at Doc. 18 and Doc. 39.

**SO ORDERED.**

Dated:    White Plains, New York
          July 17, 2024

_____
PHILIP M. HALPERN
United States District Judge